Emily Torstveit Ngara  **DETAINED**
Deportation Defense Clinic
108 Hofstra University
Hempstead, NY 11549-1080
*Counsel for Respondent*

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## NEW YORK, NEW YORK

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Joaquin Orellana Castañada ) | File No.: A 212-948-165 |
| ) | |
| Respondent ) | |

**Immigration Judge Lauren T. Farber**    Next hearing: August 25, 2017 at 9:00 am

**RESPONDENT'S MOTION TO TERMINATE PROCEEDINGS AND SUPPRESS EVIDENCE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
NEW YORK, NEW YORK

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| Joaquin ORELLANA CASTAÑADA ) | IN REMOVAL PROCEEDINGS |
| A 212-948-165 ) | |
| ) | |
| Respondent ) | |
| _____) | |

## RESPONDENT'S MOTION TO TERMINATE PROCEEDINGS AND SUPPRESS EVIDENCE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Respondent, Joaquin Orellana Castañada ("Mr. Orellana"), moves to terminate removal proceedings and alternatively to suppress evidence obtained by Immigration and Customs Enforcement (ICE) April 24, 2017, as well as the fruits of that evidence. Respondent moves to terminate proceedings because ICE officials issued an immigration detainer against him in violation of controlling immigration statutes and regulations, which resulted in a violation of his fundamental rights. *Rajah v. Mukasey*, 544 F.3d 427, 446-447 (2nd Cir. 2008). Alternatively, Respondent moves to suppress any and all evidence obtained or derived as a result of widespread violations of the Fourth Amendment to the U.S. Constitution. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050-51 (1984); *Cotzojay v. Holder*, 725 F.3d 172, 179 (2d Cir. 2013). The motion is supported by this Memorandum of Points and Authorities and the Mr. Orellana's affidavit.

### STATEMENT OF FACTS AND PROCEEDINGS

Between 2:00 and 3:00 am on April 23, 2017, officers with the Suffolk County Sheriff's Office pulled Respondent, Joaquin Orellana Castañeda, ("Mr. Orellana")'s car over. Tab A.

1

Affidavit of Joaquin Orellana Castañeda at ¶ 2 (hereinafter Orellana Affidavit). The officers requested his license and registration. *Id.* Mr. Orellana gave the officers the car registration and his Brentwood ID card. *Id.* Mr. Orellana's passport was in the glove compartment of the car. *Id.* at ¶ 3. The officers also checked the IDs of Mr. Orellana's three passengers. *Id.* at ¶ 2. The officers then requested permission to search Mr. Orellana's vehicle, stating that they were concerned about gang activity. *Id.* at ¶ 3. Mr. Orellana gave his permission to search the vehicle, and he and his passengers sat on the curb in front of the car while the officers conducted the search. *Id.*

Upon concluding the search, the officers told Mr. Orellana's passengers that they were free to leave. *Id.* at ¶ 4. The officers asked Mr. Orellana to stand on one leg, then administered a breathalyzer test. *Id.* At that time, the officers informed Mr. Orellana that he was under arrest for driving while intoxicated. *Id.*

The officers took Mr. Orellana to the Fifth Precinct where they handcuffed him to a table and sat him facing a window. *Id.* at ¶ 5. On the other side of the window, one of the officers filled out a report. *Id.* After an hour to an hour and a half, an interpreter came in and explained to Mr. Orellana that the officers wanted to perform a second breathalyzer test, but said they needed Mr. Orellana's consent. *Id.* at ¶ 6. Mr. Orellana consented and took the second breathalyzer. *Id.* Mr. Orellana remained handcuffed to the table for the rest of the night. *Id.* at ¶ 7. He did not receive food or water during his time at the Fifth Precinct. *Id.*

At 9:00 am officers transported Mr. Orellana to court where the Judge told him through an interpreter that for a first offense, she would set bail between $500 and $1,000 and told him his next hearing would be on Tuesday, April 25, 2017 at 9:00 am. *Id.* at ¶¶ 7-8. Mr. Orellana received a piece of paper with his new hearing date and time. *Id.* at ¶ 8. Mr. Orellana remained at

2

the courthouse for most of the day. *Id.* At about 5:00 pm, officers took Mr. Orellana to Yaphank Correctional Facility. *Id.* Facility personnel checked Mr. Orellana over, gave him a uniform, an ID bracelet, and a piece of paper indicating his bail was set at $1,000, and put him in a quarantine cell. *Id.* at ¶ 9.

The following morning, Monday, two ICE officers came to the facility. *Id.* at ¶ 10. One interviewed Mr. Orellana and the other interviewed another man. *Id.* The ICE officer asked Mr. Orellana questions about his immigration status and entry into this country, his family, his work, how long he had lived in New York. *Id.* Mr. Orellana answered the officer's questions because he was nervous, as he had never been in jail before. *Id.* The officer asked Mr. Orellana to sign a paper, but Mr. Orellana refused. *Id.* The officer told him that if he wanted to see an Immigration Judge he needed to sign another paper, which he did. *Id.* ICE then faxed an I-247 detainer request to the Suffolk County Correctional Facility. Tab B, I-247 Immigration Detainer.

At 4:12 pm on Monday, April 2017, Mr. Orellana's cousin posted his bail. Tab C, Suffolk County Sheriff's Office Bail and Fine Receipt. At lunch on Tuesday, April 25, Mr. Orellana asked facility personnel why he had not been taken back to court for his 9:00 am hearing before the Judge. Tab A, Orellana Affidavit at ¶ 11. The man replied that there had been a change in his paperwork, and would not give any additional information. *Id.* The facility personnel did not inform Mr. Orellana that his bail had been paid, and they did not give him a copy of the detainer request, despite the language of the detainer itself indicating that "[t]he alien must be served with a copy of this form for the detainer to take effect." *Id.* at ¶ 9; Tab B, Immigration Detainer.

On Wednesday evening, the Suffolk County Sheriff's Office transported Mr. Orellana to the Riverhead Correctional Facility. Tab A, Orellana Affidavit at ¶ 12. The following morning, ICE took custody of Mr. Orellana and processed him at Varick Street before sending him to the

3

Bergen County Correctional Facility. *Id.* Only after arriving at Bergen County did Mr. Orellana learn that his cousin had paid his bail on Monday afternoon. *Id.*

On August 3, 2017, Mr. Orellana appeared with undersigned counsel at a Master Calendar Hearing. Mr. Orellana, through counsel, denied the factual allegations set forth on the Notice to Appear and denied the charge of removability. Mr. Orellana then indicated his intent to file a motion to suppress evidence and terminate proceedings. This Court set the date of August 14, 2017 for the filing of this motion and set the case over for a hearing on August 25, 2017 at 9:00 am.

## ARGUMENT

I. **RESPONDENT'S REMOVAL PROCEEDINGS SHOULD BE TERMINATED BECAUSE ICE COMMITTED STATUTORY, REGULATORY, AND POLICY VIOLATIONS IN THE COURSE OF PLACING HIM IN PROCEEDINGS**

The Court should terminate the removal proceedings against Mr. Orellana because he is in removal proceedings as a result of ICE's statutory and regulatory violations, which caused his unlawful detention and resulted in his transfer to ICE custody. The Second Circuit has held that removal proceedings are "invalid" when ICE violates its own rules that affect the rights of a Respondent. *Waldron v. I.N.S.*, 17 F.3d 511, 518 (2nd Cir. 1993). Where the violation occurs before hearings commence, termination is proper where the violations result the deprivation of the respondent's fundamental rights. *Rajah v. Mukasey*, 544 F.3d 427, 446-447 (2nd Cir. 2008). The statute, regulation, and policy at issue here are all designed to protect Mr. Orellana's fundamental rights, and ICE's violations resulted in actual deprivation of his fundamental rights.

In this case, ICE's actions caused the Suffolk County Sheriff's Office (SCSO) to detain Mr. Orellana for more than 48 hours after the SCSO no longer had reason to keep him in custody. ICE caused this unnecessary detention, and in doing so, violated the relevant statute

4

governing detainers as well as its own regulation and policy. First, ICE issued the immigration detainer against Mr. Orellana in circumstances not authorized by the detainer statute, INA § 287(d). The limitations in INA § 287(d) are designed to protect Mr. Orellana's due process rights. Second, the regulation implementing the detainer statute, 8 C.F.R. § 287.7, must be read to incorporate the limitations of its authorizing statute. Therefore, ICE also violated its own regulation by issuing the immigration detainer. Third, ICE issued a detainer against the regulatory requirement that detainers only be issued when "gaining immediate physical custody is either impractical or impossible." INA § 287(d), 8 C.F.R. § 287.7(a). Finally, ICE violations of the INA and C.F.R. resulted in a violation of Mr. Orellana's Fifth Amendment due process rights. ICE did not serve Mr. Orellana with the detainer while he was in SCSO custody, and he was thus unable to challenge his continued detention by SCSO.

The violations of the statute, regulation, and policy implicate fundamental statutory and constitutional rights. ICE's violations resulted in the deprivation of Mr. Orellana's fundamental Fourth Amendment right to be free from unreasonable search and seizure and his Fifth Amendment right to be free from deprivation of liberty without due process of law. As such, Second Circuit law requires that this Court terminate Mr. Orellana's removal proceedings. *See Rajah*, supra, 544 F.3d at 446-447.

### A. Termination is Required when ICE Commits Statutory, Regulatory, and Policy Violations, and Where the Violations Result in the Deprivation of Fundamental Rights

It has long been held that "the rules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency." *Montilla v. INS*, 926 F.2d 162, 166 (2nd Cir. 1991). It is also settled law that statutory limits on agency powers are absolutely binding: "[A]n agency literally has no power to act…unless and until Congress confers power

5

upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Natural Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2.d Cir. 2004); *Alt. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (an agency is "a creature of statute, having no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress") (internal quotation marks and citation omitted) (emphasis in the original).

The Supreme Court held in *United States ex. rel. Accardi v. Shaughnessy*, that the principle that agencies must abide by their own regulations is so fundamental that the remedy is termination of proceedings. 347 U.S. 260 (1954). In *Accardi*, the Court vacated a deportation order finding that the proceeding below violated the agency's own regulations. *Id.* Courts have since applied the *Accardi* doctrine to a number of other contexts. *See Montilla*, 926 F.2d. at 167 (indicating that the doctrine has been used to overturn convictions and vacate employee discharges, among other applications).

The Second Circuit has consistently applied the *Accardi* doctrine to removal proceedings. When ICE violates one of its own regulations implicating "fundamental rights derived from the Constitution or federal statutes," that violation makes the proceedings "invalid[]" without requiring proof of actual prejudice. *Waldron, supra*, 17 F.3d at 518; *see also Singh*, 461 F.3d at 296. In applying the *Accardi* doctrine, the Second Circuit has explicitly rejected BIA precedent, finding instead that the respondent need not show prejudice to invalidate removal proceedings: "We...decline to adopt the *Calderon-Medina* approach, which requires a demonstration of prejudice irrespective of whether the subject regulation was designed to protect a fundamental right derived from the Constitution or a federal statute." *Waldron, supra*, at 518. The Second Circuit applied the doctrine to regulations even where they "require[] more than would the specific provision of the Constitution or a federal statute that is the source of the right," if the

6

regulations were "promulgated to protect a fundamental right." *Id*; *see also Sing*, 461 F.3d at 296 (holding that an agency's failure to follow its own regulations is "reversible error").

The Second Circuit has articulated additional guidelines to prevent termination as a result of "harmless, non-egregious pre-hearing regulatory violations." *Rajah*, *supra*, 544 F.3d at 448. Termination is the appropriate remedy when the violation meets one of the three conditions: the violation must (1) result in "prejudice that may have affected the outcome of the proceeding"; (2) involve "conscience-shocking conduct"; *or* (3) result in "a deprivation of fundamental rights." *Id.* at 447 (emphasis added). The violations in Mr. Orellana's case occurred pre-hearing. Mr. Orellana's illegal detention which resulted from the ICE detainer issued in violation of ICE's own regulations deprived him of fundamental rights, including his Fourth and Fifth Amendment rights against unreasonable search and seizure and deprivation of liberty without due process of law. This Court must, therefore, terminate the proceedings against him.

If an agency must abide by its regulations, it follows that the agency must abide even more strictly to the statutes enacted by Congress to govern the agency. The consequences for violating those rules must be enforced accordingly. An agency is a "creature of statute" and "has no power to act" outside the boundaries of its statutory authorization. *Abraham*, supra, 355 F.3d at 202. The authorizing statute constitutes the boundaries for all agency conduct. The *Accardi* doctrine requires termination of proceedings when agencies violate their own regulation and must apply with particular vigor to agency violations of an authorizing statute.

The *Rajah* court held that termination was appropriate in the case of pre-hearing regulatory violations only if accompanied by one of the three factors listed above, but explained that a remedy would be required if the agency's actions contravened the statute: "Petitioners argue that the Attorney General had no statutory authority to enact the Program. If the Program

7

was in fact simply rogue misconduct be immigration authorities, some remedy, the dimensions of which we need not address, would be called for." 544 F.3d at 434-435.

This Court has jurisdiction to determine whether Ice has violated the INA or internal regulations. *Matter of Hernandez-Puente*, 20 I. & N. Dec. 335, 339 (BIA 1991) ("[T]his Board is empowered to find that a violation of the statutes or regulations has infringed upon an alien's procedural rights, which may in turn affect determinations regarding deportability, exclusion, relief from deportation or exclusion, or other benefits under the immigration laws."). The party raising the claim has the burden of proving a prima facie case. *Matter of Tang*, 13 I. & N. Dec. 691, 692 (1971).

Upon establishing a prima facie case of a violation, ICE must justify the manner in which it acted. Mr. Orellana must only: (1) present a prima facie case that ICE violated its statutory, regulatory, and policy rules, and (2) in the case of pre-hearing regulations, establish a prima facie case that the violation deprived him of a fundamental right, prejudiced his case, or involved conscience-shocking conduct. If ICE cannot demonstrate compliance with its regulations, the authorizing statute, or its policies, nor show that the violation did not deprive Mr. Orellana of his fundamental rights, prejudice his case, or involve conscience-shocking conduct, then termination is appropriate and required under *Waldron*, *Singh*, and *Rajah*. In this case, ICE's violation of its regulations is clear, and this Court must terminate the invalid removal proceedings against Mr. Orellana.

### B. Proceedings Must Be Terminated Because ICE's Issuance of an Immigration Detainer Against Mr. Orellana Violated INA § 287(d)

At 4:12 pm on April 24, 2017, Mr. Orellana's cousin paid his bail to the SCSO, ending the state's lawful justification for detaining Mr. Orellana. Tab C, Suffolk County Sheriff's Office

8

Bail and Fine Receipt. However, because ICE had lodged an immigration detainer against him, Mr. Orellana was not released. ICE caused Mr. Orellana to be held solely on the basis of the immigration detainer until ICE could transfer him into ICE custody. The immigration detainer issued by ICE against Mr. Orellana violated the statutory scheme for immigration detainers in the INA.

INA § 287(d) is the only section of the INA that addresses immigration detainers. It provides:

> In the case of an alien who is arrested by a Federal, State, or local law enforcement official *for violation of any law relating to controlled substances*, if the official (or another official)—
>
> (1) has reason to believe that the alien may not have been lawfully admitted into the United States or otherwise is not lawfully present in the United States,
> (2) expeditiously informs an appropriate officer or employee of the Service authorized and designated by the Attorney General of the arrest and of facts concerning the status of the alien, and
> (3) *requests the Service to determine promptly* whether or not to issue such a detainer to detain the alien,
> the officer or employee of the Service shall promptly determine whether or not to issue such a detainer. If such a detainer is issued and the alien is not otherwise detained by Federal, State, or local officials, the Attorney General shall effectively and expeditiously take custody of the alien. INA § 287(d) (emphasis added).

The statute imposes at least two explicit and unambiguous limitations on ICE's authority to issue detainers: (1) ICE may issue a detainer only when the subject has been arrested for a violation "relating to controlled substances"; and (2) ICE may issue a detainer only if the law enforcement official, after developing "reason to believe" the alien is not lawfully present, initiates contact with ICE and "requests" a detainer determination.

9

ICE may argue that it has plenary authority to issue detainers regardless of the limitations outlined in INA § 287(d). This claim of broad extra-statutory authority is, however, incompatible with the legislative history of INA § 287(d) and traditional canons of statutory construction.

The legislative history of INA § 287(d) indicates that the drafters understood that they were creating a new authority to issue detainers, not codifying part of an existing plenary detainer authority. The conference report explains that INA § 287(d) "finally ma[de] it possible for the INS to respond effectively when aliens are convicted for the manufacture and distribution of opium and cocaine derivatives and 'designer drugs.'" Immigration Reform and Control Act— Conference Report, 132 Cong. Rec. S. 16879 (Oct. 17, 1986); *see also Cevilla v. Gonzales*, 466 F.3d 658, 661 (7th Cir. 2006) (when determining legislative intent, the "report of a conference committee is one of the more reliable forms of legislative history").

To find an inherent extra-statutory authority to issue detainers would be to render INA § 287(d), which sets forth the limited and specific circumstances in which a detainer may be issued, meaningless. That would violate the "cardinal principle of statutory construction that a statute ought...to be so construed that...no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). Thus, the only permissible interpretations are that either INA § 287(d) created a new detainer authority as suggested by the legislative history, or that INA § 287(d) limited ICE's inherent detainer authority from the moment of enactment.

Either of the above interpretations lead to the conclusion that ICE is only authorized to issue detainers in the limited circumstances set forth by INA § 287(d). This is consistent with the overall structure of the INA, in which Congress has carefully outline the limited circumstances in which individuals can be arrested and held for immigration purposes. Arrests can be made only

upon issuance of a warrant by the Attorney General, when an immigration officer witnesses an individual entering the Unites States unlawfully, or when an officer has reason to believe that the immigrant is "likely to escape" before the issuance of a warrant, and providing that warrantless arrests be reviewed without unnecessary delay. *See* INA §§ 236(a); 287(a). Congress has also limited the authority of state and local police to arrest and detain individuals for immigration purposes to certain narrow circumstances. *See* INA §§ 103(a)(10); 274(c); 287(g); and 8 U.S.C. § 1253c.

The circumstances of Mr. Orellana's case compel termination under the law of the Second Circuit. Mr. Orellana was arrested and charged with Driving While Intoxicated, in contravention of NY VTL 1192, Driving While Intoxicated, First Offense, and traffic infractions, none of which are controlled substance offenses. *See* 21 U.S.C. § 802(6) ("The term 'controlled substance' means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter. The term does not include distilled spirits, wine, malt beverages, or tobacco, as those terms are defined or used in subtitle E of the Internal Revenue Code of 1986.") As such, ICE violated the express language of INA § 287(d) when issuing an immigration detainer against him. This violation resulted in the SCSO unlawfully detaining Mr. Orellana from the time his bail was paid by his cousin at 4:12 pm on Monday, April 24, 2017 until he was transferred into ICE custody some time on April 27, 2017 in violation of his fundamental rights against unreasonable seizure and deprivation of liberty without due process of law under the Fourth and Fifth Amendments. As the violation impacted Mr. Orellana's fundamental rights, he need not show prejudice. This Court must terminate the invalid removal proceedings against him.

### C. Proceedings Must be Terminated Because ICE Failed to Follow Its Own Regulations

ICE violated not only the authorizing statute, but also its own regulation in issuing a detainer against Mr. Orellana, who was, as noted in the previous section, not charged with violating any controlled substance law. By its own terms, 8 C.F.R. § 287.7 is intended to operate pursuant to the statutory authorization provided in INA § 287(d). The regulation is titled "Detainer provisions under § 287(d)(3) of the Act," clearly restricting its scope to that of the referenced statutory provision.

This Court should interpret the regulation as incorporating the limitations of the authorizing statute, because to do otherwise would render the regulation ultra vires and violate the constitutional principle of separation of powers. The Board of Immigration Appeals has acknowledged its obligation to interpret regulations in accordance with the canon of constitutional avoidance. *In Re Fuentes-Campos*, 21 I. & N. Dec. 905, 912 (BIA 1997) (recognizing "the canon of statutory interpretation stating that constructions of doubtful constitutional validity should be avoided where possible").

Even under a very deferential standard, ICE's apparent interpretation of 8 C.F.R. § 287.7 to allow the issuance of detainers in non controlled-substance cases is impermissible. Such an interpretation is plainly erroneous because it contradicts the plain language of the statute and overstepping the scope of the authorizing statute and cannot be controlling. *See MCI Telecom. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear."). The only permissible interpretation of the regulation is that it applies only in cases involving violations of laws relating to controlled substances. Because Mr. Orellana's case does not involve any charge relating to a controlled substance, the issuance of the detainer in his case was

12

issued in contravention of the regulation. The violation resulted in a violation of Mr. Orellana's fundamental rights under the Fourth and Fifth amendments, and the removal proceedings must, therefore, be terminated per Second Circuit precedent.

Not only did ICE's issuance of an immigration detainer in Mr. Orellana's case run afoul of the requirement that the case involve a violation of controlled substance laws, it also violated the requirement that ICE determine that it would be impracticable or impossible to gain custody of Mr. Orellana without that detainer. 8 C.F.R. § 287.7 specifically states that detainers should be issued only to allow "for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). ICE may not routinely and reflexively request the unlawful detention of individuals in the custody of local law enforcement. Detainers should be reserved for instances where gaining immediate custody "is either impracticable or impossible." *Id.*

There is no evidence in this case that it would have been impracticable or impossible for ICE to gain immediate physical custody of Mr. Orellana on April 24, 2017. The SCSO released Mr. Orellana from criminal custody on April 24, 2017 when Mr. Orellana's cousin paid his criminal bail. Nothing prevented ICE from taking custody of Mr. Orellana immediately following the payment of his bail. ICE officers were at the Yapank Correctional Facility that very morning. Instead, ICE waited for more than 48 hours to pick up Mr. Orellana from SCSO custody at the Riverhead Correctional Facility 16 miles East of Yaphank Correctional Facility and further from the ICE offices at 26 Federal Plaza 9th Floor, Suite 9-110, New York, NY, 10278. ICE cannot contend that it was impracticable or impossible to take custody of Mr. Orellana at a location closer to its offices, where officers had been earlier in the day, than where Mr. Orellana was eventually taken into custody.

13

Due to ICE's violation of its own implementing regulation which resulted in the violation of Mr. Orellana's fundamental rights, this Court must terminate the invalid proceedings against him.

### D. Proceedings Must Be Terminated Because ICE's Statutory and Regulatory Violations Resulted in the Violation of Mr. Orellana's Fifth Amendment Rights

The immigration detainer issued in violation of ICE's statutory and regulatory limitations also violated Mr. Orellana's Fifth Amendment right to be free from physical restraint, one of the most fundamental liberties protected by our Constitution, without due process of law: "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Deprivation of this basic liberty without any authorization in law goes to the heart of the protection of the Due Process Clause. Where the state deprives and individual of his liberty, it must have "a constitutionally adequate purpose for the confinement." *Jones v. United States*, 463 U.S. 354, 361 (1983) (internal quotation marks omitted). In this case, not only did ICE lack a "constitutionally adequate purpose" for the confinement, it had no statutory authority whatsoever. Where detention exceeds statutory authorization, the government actor clearly cannot meet the "constitutionally adequate purpose" test and the deprivation of liberty violates due process of law.

Moreover, it is well-settled law that the Fifth Amendment requires notice and an opportunity to contest the validity of one's detention. *See Mathews v. Eldridge*, 424 U.S. 319 (1976); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and an opportunity for hearing....") (internal citation omitted).

At no point during his detention in the SCSO facility was Mr. Orellana served with a copy of the immigration detainer or informed of any right to challenge his detention or to retain a lawyer. Tab A, Orellana Affidavit at ¶ 9. Nor was he informed that his criminal bail had been paid, at which time the SCSO's legal authority to further detain him ended. *Id.* at ¶ 12. Not only was this information withheld from him, facility personnel gave him intentionally vague and uninformative answers to his questions regarding his detention. *Id.* at ¶ 11. SCSO officials held Mr. Orellana for more than 48 hours without any understanding of the basis for that detention, without a hearing, and without any administrative procedures by which to challenge his detention.

As a result of the described violations of Mr. Orellana's fundamental rights, this Court must terminate proceedings.

### E. In the Alternative, Evidence Obtained By ICE During Mr. Orellana's Time in Suffolk County Sheriff's Office Was Obtained as Part of a Wide-Spread Practice of Rights Violations and Should be Suppressed

The Supreme Court has recognized that widespread violations of the Fourth Amendment by ICE agents can be grounds for the suppression of evidence obtained as a result of those violations. *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984); *see also Cotzojay v. Holder*, 725 F.3d 172, 179 (2d Cir. 2013) (acknowledging widespread violations of the Fourth Amendment as a basis for suppression). As discussed above, INA § 287(d) authorizes the issuance of immigration detainer only in a narrowly defined set of circumstances—specifically, where individuals are arrested for controlled substance violations and where law enforcement authorities request the issuance of a detainer. Thus, ICE's issuance of immigration detainers

15

outside those parameters exceeds the authority Congress granted the agency and constitutes a violation of the Fourth Amendment.

The Supreme Court has recognized that the reasonableness of warrantless administrative arrests depends on compliance with congressionally mandated standards. *See, e.g., Colonnade Catering Corp. v. United States*, 397 U.S. 72, 74, 77 (1970) (seizure that did not comport with the search and seizure standards fashioned by Congress was constitutionally unreasonable). Where a detention occurs without any basis in law, as it did here, the seizure clearly does not accord with any legally enforceable standards and is not reasonable. *See Malone v. Cnty of Suffolk*, 968 F.2d 1480 (2nd Cir. 1992). The issuance of a detainer in cases not involving controlled substances charges or where local law enforcement authorities did not request a detainer therefore violates the Fourth Amendment. As discussed above, no other provision grants ICE the authority to cause an individual to be detained on the basis of a detainer.

Moreover, ICE practice regarding detainers violates well-established Fourth Amendment standards. The Fourth Amendment prohibits warrantless arrest and detention absent probable cause. *See Gerstein v. Pugh*, 420 U.S. 103, 105 (1975); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991). Yet, ICE issues immigration detainers routinely, and as a matter of policy to effectuate the detention of individuals. In addition, the regulation governing the issuance of detainers allows for detention for longer than 48 hours as it excludes holidays and weekends from the calculation. *See County of Riverside, supra*, 500 U.S. at 56-57 (establishing the 48-hour rule for probable cause determinations). ICE routinely detains individuals in excess of the constitutionally mandated limit. In fact, SCSO held Mr. Orellana for more than 48 hours after his cousin paid his bail on Monday afternoon.

16

Despite the fact that these immigration detainers violate the Fourth Amendment, ICE continues to issue detainers on a wide scale. In the time period between January 28, 2017 and February 3, 2017 alone, ICE issued 3,083 detainers nationwide. *See* Tab D, US Immigration and Customs Enforcement, Enforcement and Removal Operations, Weekly Declined Detainer Outcome Report For Recorded Declined Detainers Jan. 28-Feb. 3, 2017 at 2. In fact, ICE field offices have been instructed to issue detainers "on all removable aliens in a [Law Enforcement Agency]'s custody." *Id.* at 34.

This Court has the authority to suppress evidence, including evidence of identity. *See Pretzantzin v. Holder*, 736 F. 3d 641, 647 (2d Cir. 2013) ("we join the Fourth, Eighth, and Tenth Circuits in finding that Lopez-Mendoza reaffirmed a long-standing rule of personal jurisdiction; it did not create an evidentiary rule insulating specific pieces of identity-related evidence from suppression."). The evidence resulting from the custodial interview conducted on April 24, 2017, including identity documents, notes, the affidavit previously submitted by the Office of Chief Counsel, and, should ICE attempt to introduce it, the I-213 should be suppressed as a result of ICE's widespread violations of the Fourth Amendment.

If the Court suppresses the aforementioned evidence and ICE cannot produce independent evidence to prove the factual allegations in the NTA, this Court must terminate the removal proceedings against Mr. Orellana.

## CONCLUSION

Second Circuit precedent requires that removal proceedings be terminated when, as here, ICE has engaged in behavior which violates its authorizing statute or its implementing

17

regulations when those violations impact a respondent's fundamental rights. In this case, ICE issued an immigration detainer in violation of both INA § 287(d) and 8 C.F.R. § 287.7, and those violations resulted in Mr. Orellana's unlawful detention in violation of both his Fourth Amendment right to be free from unreasonable search and seizure and his Fifth Amendment due process rights. As those rights are fundamental rights, Mr. Orellana need not show actual prejudice. Having demonstrated ICE's violations of its controlling statute and regulation resulting in the denial of his fundamental rights, the "invalid" removal proceedings against Mr. Orellana must be terminated.

In the alternative, evidence collected by ICE in widespread violation of the Fourth Amendment should be suppressed. Because ICE's issuance of immigration detainers in situations where such detainers are not authorized by statute is so widespread, the evidence collected by ICE during Mr. Orellana's detention, including identity documents and the notes or other testimonial evidence from Mr. Orellana's custodial interview should be suppressed. If the government cannot prove Mr. Orellana's alienage by clear and convincing independent evidence obtained in accordance with the Fourth Amendment, the proceedings against Mr. Orellana must be terminated.

Dated August 14, 2017

Respectfully submitted

_____
Emily Torstveit Ngara, Esq.
Director, Deportation Defense Clinic
108 Hofstra University
Hempstead, NY 11549-1080
*Counsel for Respondent*

18