# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOAQUIN ORELLANA CASTANEDA and GERMAN HERNANDEZ ARGUETA, <br><br> on behalf of themselves and all others similarly situated <br><br> *Plaintiffs-Petitioners*, <br><br> v. <br><br> COUNTY of SUFFOLK; Steven Bellone, County Executive, County of Suffolk, *in his official* capacity; SUFFOLK COUNTY SHERIFF'S OFFICE; Errol Toulon, Jr., Sheriff, Suffolk County Sheriff's Office, *in his official capacity*; and other individuals in charge to be identified, <br><br> *Defendants-Respondents*. | Case No. 2:17-cv-04267-JFB-ARL <br><br><br> **<u>SECOND AMENDED COMPLAINT</u>** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Joaquin Orellana Castaneda ("Mr. Orellana") and German Hernandez Argueta ("Mr. Hernandez"), by and through their attorneys, hereby bring this Second Amended Complaint against Defendants County of Suffolk, Steven Bellone, Suffolk County Sheriff's Office ("SCSO"), Errol Toulon, Jr., and other individuals in charge to be identified (collectively, "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1. By this second amended complaint ("Complaint"), Plaintiffs-Petitioners ("Plaintiffs") challenge the policy and practice of the SCSO and its officials of complying with "detainer" requests from the federal government agency Immigrations and Customs Enforcement ("ICE"). By means of detainers, ICE requests that local law enforcement agencies such as SCSO retain individuals in custody for up to 48 hours after they would otherwise be released, to allow ICE to take custody of those individuals at its leisure and place them into removal proceedings.

SCSO's policy of unquestioning compliance with these requests deprived Plaintiffs of their freedom, their families and their livelihoods, and violated their rights under the Fourth and Fourteenth Amendments of the United States Constitution and under the First Article of the New York Constitution.

2.      On or about April 23, 2017, Plaintiff Mr. Orellana was arrested by Suffolk County police and remanded to the custody of the SCSO at the Yaphank jail.  ICE subsequently issued a detainer requesting that SCSO maintain custody over Mr. Orellana for up to an additional 48 hours beyond his scheduled release date.  Bail was set the following day, and his family paid it, but he was not released.  Instead, SCSO unlawfully extended his detention until April 27, 2017 in order to transfer custody of his person to ICE.

3.      Similarly, on July 2, 2017, Plaintiff Mr. Hernandez was arrested by the Suffolk County Police and remanded to the custody of the SCSO.  ICE subsequently issued a detainer requesting that SCSO maintain custody over Mr. Hernandez for up to an additional 48 hours beyond his scheduled release date.  Upon disposition of Mr. Hernandez's criminal case, at which time he should have been released, he was instead remanded back to the custody of SCSO on August 18, 2017.  Immediately following that remand, Plaintiffs filed their First Amended Complaint in this action.  The same evening, a few hours after the filing of the First Amended Complaint, ICE took custody of Mr. Hernandez.

4.      Mr. Hernandez was released on bond from ICE's custody on or about January 23, 2018.  Six weeks later, on or about March 9, 2018, Mr. Hernandez was once again arrested by Suffolk County police and remanded to the custody of the SCSO.  Once again, ICE issued a detainer requesting that SCSO maintain custody over Mr. Hernandez for an additional 48 hours beyond his scheduled release date.  Upon disposition of Mr. Hernandez's criminal case the

following day, at which time he should have been released, he was instead remanded back to the custody of SCSO.  That evening, ICE took custody of Mr. Hernandez.  Mr. Hernandez remains in ICE's custody as of the filing of this Second Amended Complaint.

5. On information and belief, SCSO has no procedures in place to ensure that the subjects of detainers receive adequate notice of the detainers' terms.  Moreover, even though the detainer form states that "the alien must be served with a copy of this form," neither ICE nor SCSO provided Mr. Orellana with a copy of his ICE detainer until several days after it was issued. When Mr. Orellana did finally receive a copy of his detainer, it was written only in English, a language Mr. Orellana does not speak.  Mr. Hernandez was never served with a copy of his first ICE detainer (for the 2017 arrest) at all.

6. Plaintiffs seek damages under the First Article of the New York Constitution for the violation of their rights.

7. Plaintiff Mr. Hernandez also seeks on his behalf and on behalf of similarly situated individuals who have immigration detainers lodged against them, declaratory and injunctive relief under the Administrative Procedures Act, 5 U.S.C. §706(a), and under the Fourth and Tenth Amendments of the U.S. Constitution for the ongoing violation of their rights.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and the laws of the United States.  This Court also has supplemental jurisdiction over this action's New York Constitution claim pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims arising under the Constitution and laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

9. This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201

and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

10.    This Court has authority to grant injunctive relief in this action pursuant to 5 U.S.C. § 702 and Rule 65 of the Federal Rules of Civil Procedure.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred, and continue to occur, in this District.

## PARTIES

12.    At the time this action was commenced, Plaintiff Joaquin Orellana Castaneda was a 34-year-old resident of Suffolk County detained at the Bergen County Jail in Hackensack, New Jersey under the authority of ICE.  As described above, he was detained by SCSO pursuant to a detainer request even after paying his bail, and was transferred by SCSO to ICE custody several days thereafter.

13.    At the time the First Amended Complaint in this action was filed, Plaintiff German Hernandez Argueta was a 22-year-old resident of Suffolk County, detained by the SCSO.  As described above, he has twice been detained by SCSO pursuant to detainer requests past the time that he should otherwise have been released, and then taken into custody by ICE.

14.    Defendant County of Suffolk ("County") is a duly constituted municipal corporation of the State of New York.  Upon information and belief, the County has direct authority over Defendant SCSO.  The County and/or its employees, agents or representatives are involved in the violations of constitutional and statutory rights alleged herein.

15.    Defendant Steven Bellone ("Bellone") is the County Executive of the County of Suffolk.  Defendant Bellone is, among other responsibilities, charged with the administration of the County of Suffolk.  He is sued in his official capacity.

16.     Defendant SCSO is an entity, agency, department, and/or subdivision of the County.  The SCSO and/or its employees, agents or representatives are involved in the violations of constitutional and statutory rights alleged herein.

17.     Defendant Errol Toulon, Jr. is the Sheriff of Suffolk County and presides over the Suffolk County Sheriff's Office as its chief executive officer.  He has held this position since January 12, 2018.[1]  Upon information and belief, Defendant Toulon has direct authority over the SCSO.  He is sued in his official capacity.

### PLAINTIFFS' DETENTION

18.     Seeking to escape crime and violence in his native country, Mr. Orellana made his way to the United States in 2005, and settled in Suffolk County, New York.  He worked at a nursery that sells plants wholesale to retail stores, and lived modestly so as to send as much of his earnings as possible to family members back home.

19.     Mr. Orellana was arrested in the early morning hours of April 23, 2017 in Central Islip, New York, for violations of the Vehicle and Traffic Law. That same day, Mr. Orellana was brought before a Suffolk County judge, who set Mr. Orellana's bail at $1000 and remanded him to the custody of the SCSO.  Mr. Orellana spent the remainder of the day and night at Yaphank Correctional Facility ("Yaphank") in Yaphank, New York.

20.     The next day, April 24, 2017, Mr. Orellana was interviewed by ICE agents while under SCSO custody at Yaphank.  Mr. Orellana was told that if he paid his bail, then he would be released and would eventually have to appear at an immigration hearing.  That same day, Mr.

---

[1] Prior to January 12, 2018, the office of Sheriff of Suffolk County was held by Vincent DeMarco. Plaintiffs accordingly named Mr. DeMarco as a defendant when they commenced this action. Plaintiffs now substitute Mr. Toulon for Mr. DeMarco pursuant to Fed. R. Civ. P. 25(d).

Orellana's cousin paid Mr. Orellana's bail.  A true and correct copy of the bail receipt is attached hereto as Exhibit A.

21.     However, no one informed Mr. Orellana that his bail had been paid, and SCSO continued to hold Mr. Orellana at Yaphank pursuant to an ICE detainer after his bail had been paid. SCSO did not serve Mr. Orellana with a copy of the detainer at that time. A true and correct copy of Mr. Orellana's detainer and accompanying I-200 administrative warrant is attached hereto as Exhibit B.  Though it is dated April 24, 2017, the certificate of service at the bottom is blank.

22.     On April 25, 2016, while Mr. Orellana remained at Yaphank, a member of SCSO told him that there was a change in his paperwork, and gave no further explanation.  The next day, April 26, 2017, Mr. Orellana was transferred from Yaphank to the Riverhead Correctional Facility ("Riverhead") in Riverhead, New York.

23.     Upon information and belief, on or about April 27, 2017 (and certainly well after Mr. Orellana should have been released from custody due to the payment of his bail), Mr. Orellana was transferred into ICE's custody, and taken from Riverhead to ICE's Varick Street Detention Center ("Varick Street") in New York, New York. There, Mr. Orellana was questioned by ICE agents and given forms to sign.  Those forms included another copy of the I-200 warrant that had accompanied his detainer, but this time the I-200 was dated (by the ICE officer, not by Mr. Orellana) April 26, 2017. A true and correct copy of this second I-200 is attached hereto as Exhibit C.  Later that night, Mr. Orellana was transferred from Varick Street to the Bergen County Jail.  In the fall of 2017, Mr. Orellana accepted a voluntary departure to Guatemala.

24.     Like Mr. Orellana, Mr. Hernandez also fled his home due to gang threats and violence.  He left his mother and sisters in 2014 at the age of 19, and came to live with his aunt

and her family in Suffolk County.  Mr. Hernandez works in landscaping and snow removal, and sends money to his mother and sisters to help support them.

25.     On or about June 1, 2017, Suffolk County police approached Mr. Hernandez at a 7-11 and asked his name without any objective credible reason, founded suspicion, or legal basis to do so. Frightened and taken aback by the arbitrary questioning, he stammered out a friend's name instead of his own.  The police officers searched Mr. Hernandez's pockets.  They discovered a money transfer receipt (from sending money to his mother earlier that day), and saw that the name on the receipt was different from the name Mr. Hernandez had told them.  Mr. Hernandez admitted that he had been scared and that the name on the receipt was his real name.  The officers arrested him for false personation and took him to the precinct for the day.  He was taken to court the following day and arraigned, released on his own recognizance, and given a date to return to court.

26.     Mr. Hernandez inadvertently lost the paper with his court date and could not remember when he was to return.  Then, on July 2, 2017, Suffolk County police (who had a photo of Mr. Hernandez in their hands) questioned him at a gas station where he was sitting with a friend, and asked his name.  Mr. Hernandez was afraid that he was in trouble for missing his court date, and again gave a friend's name.  The police arrested him again for false personation and took him to the local precinct.  He was eventually arraigned before a Suffolk County judge, who set bail at $500 and remanded him to the custody of the SCSO.

27.     On July 3, 2017, Mr. Hernandez was transferred to Yaphank.  While in the custody of the SCSO, he was questioned by ICE agents stationed at the jail about his immigration status, and given English forms to sign.  Mr. Hernandez refused to sign the forms, and was not provided with copies.

28.     A few days later, on July 7, 2017, ICE issued a detainer and accompanying I-200 administrative warrant for Mr. Hernandez, copies of which are attached hereto as Exhibits D and E, respectively.  Neither ICE nor SCSO served Mr. Hernandez with copies of the documents at that time, as is evident on the face of the documents themselves.  The certificate of service on the detainer is left blank.  The certificate of service on the I-200 administrative warrant is dated August 19, 2017—six weeks after it was issued, and a day *after* Mr. Hernandez was taken into ICE custody, as described below.

29.     On August 18, 2017, Mr. Hernandez pled guilty to disorderly conduct, a violation, and was sentenced to time already served. However, instead of releasing Mr. Hernandez, SCSO retained him in custody pursuant to the detainer request issued by ICE.  During this time, Plaintiffs filed the First Amended Complaint in this action.  Later in the evening of August 18, ICE took custody of Mr. Hernandez.

30.     On or about January 23, 2018, Mr. Hernandez was released on bond from ICE's custody.  Six weeks later, on or about March 9, 2018, Mr. Hernandez was biking home from work at the supermarket when he was approached by Suffolk County police.  They asked his name, and he gave his real name:  Enrique Hernandez.  (Mr. Hernandez prefers to be called by his middle name, Enrique, rather than his first name, Germán.)  But he had no identification on his person, and so he agreed to take the police officers to his home.  There, he showed them various documents with his name on them.  The police officers, however, misunderstood him to have given his name as "Eric" rather than "Enrique," and so arrested him once again for false personation.  The police also added a charge for criminal possession of a weapon in the fourth degree by a non-U.S. citizen, because Mr. Hernandez had had a box cutter on his person from his supermarket job, which he used for cutting open boxes of produce.

31.     Mr. Hernandez was arraigned the next day, March 10, 2018, and remanded to the custody of the SCSO at Yaphank jail.  That same day, ICE issued a new detainer request to SCSO, along with a new I-200 administrative warrant.  This time, an ICE agent served Mr. Hernandez with copies of the documents.

32.     On March 30, 2018, the district attorney offered a plea of one day's adjournment in contemplation of dismissal, which Mr. Hernandez accepted.  Mr. Hernandez was taken back to Yaphank, where he signed a release form, but was not released.  Instead, later that evening he was taken to Riverhead, where he remained all through the weekend.  On Monday morning, he was taken to ICE's Varick Street jail, questioned again by ICE agents, and then taken to the Hudson County jail in Kearney, New Jersey, where he remains under ICE's custody to date.

### THE DETAINER SYSTEM

33.     Pursuant to 8 U.S.C. § 1103(a), the Department of Homeland Security, through its division of ICE, purports to have the authority to issue detainers in accordance with the intent and requirements of the Immigration and Nationality Act ("INA").

34.     As of June 13, 2017 ICE has increased the issuance of detainers 75 percent compared with the same time period in 2016.  Relatedly, a Washington Post article reports that ICE has deputized over 40 local law enforcement agencies to help ICE enforce immigration law, and that besides conducting its own searches, ICE uses a fingerprint-sharing program to learn when an undocumented immigrant has been arrested by state or local authorities.

35.     SCSO has stated that its policy—unlike that of many other law enforcement agencies—is to comply with detainer requests by holding the individuals in question for up to 48 hours past the time when they would otherwise be released to allow ICE to decide whether to take custody of a detainee and then take custody of those it chooses.

36.     The process works as follows:  When ICE learns that SCSO has taken custody of a

person whom ICE believes to be subject to removal from the United States, it lodges a detainer with SCSO. The detainer is a form that asks SCSO to:

> **Maintain custody** of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody. The alien **must be served with a copy of this form** for the detainer to take effect.

37.     The detainer also informs SCSO that "DHS has determines that probable cause exists *that the subject is a removable alien*." And it checks off one or more of four boxes to indicate the basis for this statement. The four options are:

"1.     A final order of removal against the alien;

 2.     The pendency of ongoing removal proceedings against the alien;

 3.     Biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, *by themselves or in addition to other reliable information*, that the alien *either* lacks immigration status *or* notwithstanding such status is removable under U.S. immigration law; and/or

 4.     Statements made by the alien to an immigration officer *and/or other reliable evidence* that affirmatively indicate the alien *either* lacks immigration status *or* notwithstanding such status is removable under U.S. immigration law." (emphases added).

37.     Notably, not a word in the detainer refers to any probable cause that a *crime* has been committed by the individual in question. Being a "removable alien" is a civil, not criminal, violation of the INA. And SCSO does not have the authority to arrest or detain individuals for civil violations of the INA.

38.     Further, the language of check boxes three and four provides little guidance as to the actual basis for ICE's determination.   For instance, by checking box four, ICE purportedly indicates its belief that the individual is removable on the basis of statements (what statements?) made to an immigration officer, *or* "other reliable evidence" (what evidence?), *or* both, indicating a lack of immigration status, *or* the existence of status but also of another basis for removal (what

basis?).  These vague check-box statements riddled with disjunctives do not adequately place SCSO or the recipients of detainers on notice of the basis for their detention.

39.     Detainers are also sometimes accompanied by an I-200 administrative arrest warrant.  Like the detainer, the administrative arrest warrant says nothing whatsoever about any crime having been committed.  Instead, an ICE officer simply states "I have determined that there is probable cause to believe that [name of individual] is *removable from the United States*." Detainers are not accompanied by judicial arrest warrants at all—whether for removal or for criminal detention.

40.     Both the detainer and the administrative warrant are supposed to be served upon the affected individual.  Frequently, though, this does not happen, or does not happen in a timely manner.  This was the case for both Plaintiffs here, as set forth above.

41.     Even if the subject of a detainer is timely served with the appropriate copies, there is little that he or she can do to challenge the detention.  Neither ICE nor SCSO provides an administrative procedure for challenging the issuance of a detainer.  Likewise, the Board of Immigration Appeals (BIA) has ruled that it does not have jurisdiction to consider challenges to detainers because it has found that individuals held on detainers are not in federal immigration custody.  Thus, recipients of detainers are effectively left without a viable remedy to challenge their unlawful detention.

42.     The detainers contain a paragraph entitled "notice to the detainee," which reads as follows:

> The Department of Homeland Security (DHS) has placed an immigration detainer on you. An immigration detainer is a notice to a law enforcement agency that DHS intends to assume custody of you (after you otherwise would be released from custody) because there is probable cause that you are subject to removal from the United States under federal immigration law. DHS has requested that the law enforcement agency that is currently detaining you maintain custody of you for a

period not to exceed 48 hours beyond the time when you would have been released based on your criminal charges or convictions. **If DHS does not take you into custody during this additional 48 hour period, you should contact your custodian** (the agency that is holding you now) **to inquire about your release. If you believe you are a United States citizen or the victim of a crime, please advise DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.**

43.     This notice, even if Plaintiffs had timely received it, does not constitute adequate due process.  Among other things, the inclusion of a hotline number on a notice for certain specific problems, even if Plaintiffs had been able to call it, did not afford them an adequate opportunity to challenge their detention.  And while the form contains translations of this "notice to the detainee" paragraph into Spanish and several other languages, the copy of his detainer that Mr. Orellana ultimately received omitted the notice page altogether.

44.     Prior to October 2017 (at which time ICE entered into an Intergovernmental Agreement ("IGA") with SCSO, as described further below), once a detainer was lodged against an individual, and once that individual's criminal custody came to an end, SCSO would simply continue to hold the individual in the same manner as he or she had previously been detained pursuant to his or her criminal case.  ICE would then come to the jail at its convenience, take custody of the individual and transfer him or her to one of its own detention centers.

45.     The IGA added a bit more variability to this process, in that it now permits ICE to keep its detainees in the Riverhead jail.  In other words, the Riverhead jail now houses inmates who are in the custody of SCSO on criminal matters (as it always has), *and* those who are considered (under the IGA) to be in the custody of ICE for removal proceedings.

46.     In a declaration dated December 5, 2017, Francis Kemp, Assistant Field Office Director in ICE's Office of Enforcement and Removal Operations ("ERO"), explained that there are now "four possible scenarios as to how an alien may be transferred from Suffolk County to

ICE custody from either Riverhead or Yaphank."  Two of these scenarios are ***identical to the previous process***, in which ICE simply comes to either Yaphank or Riverhead, takes physical custody of the individual and transfers him or her directly to one of its more permanent detention facilities elsewhere.  ICE now also has the option of asking SCSO to transfer the individual from Yaphank to ICE's custody at the Riverhead jail, or of simply transferring an individual already in the Riverhead jail from SCSO's custody to ICE's custody within the Riverhead jail itself.

47.     From the constitutional point of view, there is not a shred of difference between any of the "four possible scenarios."  In all four scenarios, SCSO is maintaining custody over an individual past the time when he or she should otherwise have been released, based only on ICE's say-so that there is probable cause of *removability*—not that a crime has been committed.  Nor can the SCSO wash its hands of liability by asserting that some of the individuals it is holding are constructively in ICE custody; the mere act of transferring an individual from one location to another after that individual should have been released is a violation of law.

48.     In short, irrespective of whether or not ICE has the authority to hold individuals at Riverhead or other local detention facilities pursuant to an IGA (an issue which may be contested but is not the subject of this lawsuit), there is simply no basis for  *SCSO's* practice of maintaining custody over individuals between the time their criminal case ends and the time ICE assumes custody over them.  Whether ICE, after taking custody over the individual, houses him or her at Riverhead under the IGA, or at another ICE facility, makes no difference at all to the lawfulness of SCSO's conduct.

49.     The SCSO is well aware that numerous state and federal courts have found law enforcement agencies liable for Fourth Amendment violations where they have held individuals pursuant to detainers.  Indeed, in or about 2014, Suffolk County's own attorney advised local

authorities against the honoring of detainers unless accompanied by a judicial warrant.

50.     In or about February 2017, the New York State Sheriffs' Association (of which SCSO is a member) commissioned a comprehensive review of the relevant case law in light of the issuance by ICE of its new detainer form.  The Association's report concluded that "[s]heriffs should not detain persons beyond their normal release date based on a federal detainer warrant, ***even if accompanied by an order of deportation or removal, unless there is also a judicial warrant.***" (emphasis added).  A true and correct copy of the Sheriffs' Association Report and analysis is attached hereto as Exhibit F.

51.     The SCSO, undeterred, has continued to comply with detainers, and, as in the case of Plaintiffs, to detain individuals even beyond the time requested under the detainer.  The SCSO appears similarly untroubled by the New York State Attorney General's earlier conclusion (which post-dates the introduction of the new detainer forms) that "[a]bsent a judicial warrant, [local law enforcement agencies] should honor ICE or [Customs and Border Protection] detainer requests only in limited, specific circumstances," meaning "***a showing of probable cause that the individual committed a crime or that an exception to the probable cause requirement applies***." (emphasis added) A true and correct copy of the New York State Attorney General's report is attached hereto as Exhibit G.

52.     In short, the SCSO knows, or has reason to know, that complying with detainers is unlawful.  Thus, its continued honoring of ICE detainers is a willful violation of Plaintiffs' statutory and constitutional rights.

## CLASS ACTION ALLEGATIONS

53.     Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2) and/or (c)(4), Plaintiffs, seek to represent a class (the "Class") consisting of:

All persons who were, are, or will be detained by SCSO on the basis of an ICE

detainer in which ICE requested SCSO to continue to detain the individual after SCSO's detention authority has otherwise expired.

54.     Pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiff Mr. Hernandez seeks to represent a sub-class (the "Sub-Class") consisting of:

> All persons who are or will be detained by SCSO and against whom ICE has an active immigration detainer in which ICE requested SCSO to continue to detain the individual after SCSO's detention authority has otherwise expired.

55.     The Class seeks declaratory relief—and the Sub-Class seeks declaratory and injunctive relief—that prohibits the detention of any individual by local law enforcement agencies on the basis of an ICE detainer and otherwise eliminates or remedies Defendants' application of immigration detainer policies, practices, acts, and omissions that are depriving Plaintiffs of their liberty in violation of their rights.  The Class also seeks monetary damages to compensate Plaintiffs for this unlawful detention.

56.     The proposed Class and Sub-Class are very numerous.  In FY2009, at least 223,297 individuals detained by ICE (approximately 60% of ICE's FY2009 detention population) were first stopped, arrested, or criminally convicted by local law enforcement agencies.  *See* Dora Schriro, ICE, *Immigration Detention Overview and Recommendations* at 11-12 (Oct. 6, 2009).  According to testimony given by ICE Deputy Director Thomas Homan before the House Committee on Appropriations, Subcommittee on Homeland Security, ICE has issued 78,176 detainers in the current fiscal year—a figure up 75 percent compared with the same time period in 2016.

57.     Joinder of all Class and Sub-Class members is impracticable.  Because ICE continuously lodges detainers against individuals and assumes physical custody of those held on detainers, the membership of the Class and Sub-Class changes constantly.

58.     All individuals who would fall within the Class and Sub-Class Definitions have had

SCSO's ICE detainer policies, practices, acts, and omissions applied against them, causing unlawful deprivation of liberty in violation of their rights.  There are questions of law or fact common to all Class and Sub-Class members, including, but not limited to:

- Whether SCSO's detention of a Class or Sub-Class member based only on a detainer as described above violates the Fourth and Fourteenth Amendments of the United States Constitution and/or the First Article of the New York Constitution;

- Whether SCSO's detention of a Class or Sub-Class member pursuant to a detainer without providing or requiring notice to the Class or Sub-Class member violates the Fourteenth Amendments of the United States Constitution and/or the First Article of the New York Constitution; and

- Whether SCSO's detention of a Class or Sub-Class member pursuant to a detainer without providing the Class or Sub-Class member an adequate means of challenging detainers violates the Fourteenth Amendment of the United States Constitution and/or the First Article of the New York Constitution.

59.    Given the commonality of the questions shared by all Class and Sub-Class members, prosecuting separate claims as to individual Class and Sub-Class members would establish incompatible standards of conduct for Defendants and the adjudications as to individual Class and Sub-Class members' claims might be dispositive of the interests of other Class and Sub-Class members, thus substantially impairing their ability to protect their interests.

60.    Defendants have acted and intend to act in a manner adverse to the rights of the proposed Class and Sub-Class, making final declaratory relief appropriate with respect to the Class as a whole, and making final declaratory and injunctive relief appropriate with respect to the Sub-Class.

61.    Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation.  Plaintiffs' counsel will fairly and adequately represent the interests of the Class and Sub-Class.

## FIRST CAUSE OF ACTION

### Violations of the First Article of the New York Constitution

62.     The allegations contained in paragraphs 1 through 61 above are repeated and alleged as though fully set forth herein.

63.     By virtue of the acts described above, SCSO and County deprived Plaintiffs and other members of the proposed Class and Sub-Class of liberty without due process of law in contravention of the First Article of the New York Constitution.

64.     The acts and conduct of the servants, representatives, agents, and employees of SCSO and County were the direct and proximate cause of injury and damage to Plaintiffs and other members of the proposed Class and Sub-Class and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

65.     SCSO and County are liable for the above-mentioned actions of their agents, representatives, servants, and/or employees under the doctrine of *respondeat superior*.

66.     As a result of the foregoing, Plaintiffs and other members of the proposed Class and Sub-Class were severely and seriously injured, both bodily and mentally, suffered a loss of enjoyment of life, loss of liberty, experienced pain and suffering, emotional distress, great humiliation, costs and expenses, economic loss and other damages, and were otherwise damaged and injured.

## SECOND CAUSE OF ACTION

### Violation of the Fourteenth Amendment of the United States Constitution

67.     The allegations contained in paragraphs 1 through 66 above are repeated and alleged as though fully set forth herein.

68.     Due process principles forbid the infringement of fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling government interest.

69.     The continued unauthorized detention of an individual based only on vague and ambiguous assertions by ICE that there is probable cause of removability is not narrowly tailored to serve a compelling government interest.  As Plaintiffs were detained by SCSO (under the supervision of County) past the point of their judicially authorized release, their fundamental liberty interests and those of other members of the proposed Class and Sub-Class guaranteed by the Fourteenth Amendment's substantive due process protections were violated.

70.     Due process further requires that the government be constrained before it acts in a way that deprives individuals of "liberty" interests protected under the Due Process Clause of the Fourteenth Amendment.  The Due Process Clause protects against the deprivation of liberty interests without the due process of law and requires notice and an opportunity to be heard prior to the deprivation as well as a method by which to challenge the deprivation.  Plaintiffs and other members of the proposed Class and Sub-Class were provided with none of these, in violation of their due process rights.

71.     The private liberty interests of Plaintiffs and other members of the proposed Class and Sub-Class are overwhelming.  The risk that they have been deprived of their liberty erroneously is high due to the fact that no court of law has adjudicated the lawfulness of SCSO's continued detention (under the supervision of County) of individuals past their scheduled release date.

72.     Interpreting immigration detainers as authorizing Defendants' continued unauthorized detention of Plaintiffs and other members of the proposed Class and Sub-Class without judicial review violates the procedural due process rights guaranteed by the Fourteenth Amendment and Plaintiffs and other members of the proposed Class and Sub-Class have been damaged as a result.

73.     The relief sought by Mr. Hernandez and other members of the proposed Sub-Class is necessary to prevent continued and future injury.

## THIRD CAUSE OF ACTION

### Violation of the Fourth Amendment of the United States Constitution

74.     The allegations contained in paragraphs 1 through 73 above are repeated and alleged as though fully set forth herein.

75.     Plaintiffs and other members of the proposed Class and Sub-Class are held, or have been held, in violation of the Constitution of the United States.  Plaintiffs, and other members of the proposed Class and Sub-Class were and are held solely on the basis of the ICE detainers issued in their names.  SCSO (under the supervision of County) had no legal authority to continue to hold Plaintiffs, and other members of the proposed Class and Sub-Class in custody after their judicially authorized release.

76.     SCSO's continued detention of Plaintiffs and other members of the proposed Class and Sub-Class (under the supervision of County) violated and continues to violate their Fourth Amendment constitutional right to be free from unreasonable seizure and Plaintiffs and other members of the proposed Class and Sub-Class have been damaged as a result.

77.     Upon the judicially authorized release of Plaintiffs and other members of the proposed Class and Sub-Class, Defendants' legal authority to maintain custody of Plaintiffs and other members of the proposed Class and Sub-Class ended or will end.  Defendants' continued detention of Plaintiffs and other members of the proposed Class and Sub-Class constitutes the equivalent of a new arrest.

78.     Because of this, and the fact that immigration detainers are not warrants issued upon probable cause that a crime has been committed, these detainer procedures violate the Fourth Amendment's requirement that an individual arrested without a warrant be brought before a neutral

magistrate for a probable cause hearing within 48 hours of arrest, irrespective of weekends or holidays.

79.     Plaintiffs and other members of the proposed Class and Sub-Class were not brought before a neutral magistrate for a criminal probable cause hearing.  Upon information and belief, Defendants have no process for bringing individuals subject to detainers before a neutral magistrate for a criminal probable cause hearing within 48 hours.  Defendants' detention of Plaintiffs and other members of the proposed Class and Sub-Class therefore violated their Constitutional right to be free from unreasonable seizures and they have been damaged as a result.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs and other members of the proposed Class and Sub-Class pray that this Court grant the following relief:

(1)     Issue an injunction ordering Defendants not to detain any individual solely on the basis of an immigration detainer;

(2)     Enter a judgment declaring that Defendants' detention of Plaintiffs and other members of the proposed Class and Sub-Class was unauthorized by statute and contrary to law;

(3)     Award compensatory damages in an amount to be determined at trial;

(4)     Award pre-judgment and post-judgment interest at the maximum legal rate;

(5)     Award reasonable costs and attorney's fees; and

(6)     Grant any other and further relief that this Court may deem fit and proper.

Dated:     New York, New York
           May 29, 2018                          **WINSTON & STRAWN LLP**
                                                 *Counsel for Plaintiffs*

                                            By:    */s/ Aldo A. Badini*
                                                 Aldo A. Badini
                                                 Margaret Ciavarella MacLean

Frank S. Restagno
200 Park Avenue
New York, New York 10166
(212) 294-6700
abadini@winston.com
mmaclean@winston.com
frestagno@winston.com

**LATINOJUSTICE PRLDF**
*Counsel for Plaintiffs*

By:  Juan Cartagena
     Jose Perez
     99 Hudson Street, 14th Floor
     New York, New York 10013
     (212) 219-3360
     jcartagena@latinojustice.org
     jperez@latinojustice.org