UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
JOAQUIN ORELLANA CASTANEDA and                     :
GERMAN HERNANDEZ ARGUETA,                           :
                                                    :          **DECISION AND ORDER**
                  Plaintiffs,                       :          17-CV-4267 (WFK) (ARL)
                                                    :
         v.                                         :
                                                    :
COUNTY OF SUFFOLK, *et al.*,                        :
                                                    :
                  Defendants.                       :
---------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge**:

On November 7, 2025, a unanimous jury found the County of Suffolk, the Suffolk County Sheriff's Office (the "SCSO"), the Suffolk County Executive Steven Bellone, and the Suffolk County Sheriff Errol Toulon, Jr., (together, "Defendants") liable on a class-wide basis for violating the class plaintiffs' procedural due process rights under the Fourteenth Amendment of the U.S. Constitution. The jury awarded $37 million for the due process violations and $75 million for claims under the Fourth Amendment of the U.S. Constitution and the New York State Constitution given this Court's prior finding of liability on the latter two claims. Before the Court are Defendants' motions for: (1) judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50; (2) a new trial on liability pursuant to Federal Rule of Civil Procedure 59; (3) a new trial on damages pursuant to Federal Rule of Civil Procedure 59; (4) remittitur pursuant to Federal Rule of Civil Procedure 59; and (5) decertification of the class action pursuant to Federal Rule of Civil Procedure 23. For the reasons set forth below, the Court **DENIES** Defendants' motions.

I.      **BACKGROUND**

    A.      **Facts**

        The County of Suffolk is a municipal corporation of the State of New York which has

direct authority over the SCSO, an entity, agency, and/or subdivision of the County. Pls. Local

Rule 56.1(a) Stmt. of Undisputed Material Facts (the "Pls. Stmt.") ¶¶ 1–2, 5, ECF No. 114-2[1];

---

[1] Citations are to the docket in *Orellana Castaneda, et al. v. County of Suffolk, et al.*, 17-CV-4267. Page pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

1

Def. Response to Pls. Local Rule 56.1(a) Stmt. (the "Defs. Resp.") ¶¶ 1–2, 5, ECF No. 116-2.[2]

Steven Bellone was the County Executive of the County of Suffolk. Pls. Stmt. ¶ 3; Defs. Resp. ¶ 3. Errol Toulon, Jr., has direct authority over the SCSO as the Suffolk County Sheriff. Pls. Stmt. ¶¶ 6–7; Defs. Resp. ¶¶ 6–7.

The Department of Homeland Security ("DHS")—through its division of U.S. Immigration and Customs Enforcement ("ICE")—issues immigration detainer requests pursuant to 8 U.S.C. § 1103(a), in accordance with the requirements of the Immigration and Nationality Act. Pls. Stmt. ¶ 8; Defs. Resp. ¶ 9. ICE detainer requests (Form I-247D or Form I-247X)— which are generally accompanied by an administrative warrant for the arrest of an alien (Form I-200) or for removal/deportation (Form I-205), both of which are civil in nature—communicate to local law enforcement ICE has reason to believe an individual currently in the custody of local law enforcement is subject to removal from the United States. See Pls. Stmt. ¶¶ 10–12; Defs. Resp. ¶¶ 10–12; Defs. Local Rule 56.1(a) Stmt. of Undisputed Material Facts (the "Defs. Stmt.") ¶ 12, ECF No. 113-3; Pls. Resp. to Def. Local Rule 56.1(a) Stmt. of Undisputed Material Facts (the "Pls. Resp.") ¶ 12, ECF No. 115-1. These detainer requests ask local law enforcement to detain the subject individual for up to forty-eight hours after he or she would otherwise be subject to release, allowing ICE to later assume custody. Tr. at 204:18–205:22, ECF No. 302-3; Pls. Stmt. ¶ 9; Defs. Resp. ¶ 9. A detainer request also requires the local law enforcement agency to serve the detainer request on the subject individual. Tr. at 515:21–517:24.

Between December 2, 2016, and November 15, 2018, the SCSO had an official policy of honoring ICE detainer requests and corresponding administrative warrants. See Tr. at 255:21–

---

[2] The Court cites to the parties' respective summary judgment filings only to provide background and context for the case. However, the Court evaluates the merits of Defendants' motions based on the trial record alone.

2

256:21, 697:5–698:8, 707:9–24.  On November 15, 2018, Sheriff Toulon, Jr., issued a memorandum to SCSO personnel explaining the SCSO's policy, as of that date, was to no longer hold individuals on the basis of ICE detainer requests accompanied solely by administrative warrants.  *See* Tr. at 707:9–24.

On April 23, 2017, class representative Joaquin Orellana Castaneda ("Orellana") was arrested by the Suffolk County Police Department (the "SCPD") for traffic violations and remanded to the custody of the SCSO.  *See* Tr. at 476:14–477:2; Defs. Stmt. ¶ 7; Pls. Resp. ¶ 7; Pls. Stmt. ¶¶ 25–26; Defs. Resp. ¶¶ 25–26.  On April 24, 2017, ICE issued a detainer request and accompanying I-200 administrative warrant for Orellana.  *See* Pls. Ex. 50B at 001[3]; Tr. at 489:18–490:12; Defs. Stmt. ¶ 8; Pls. Resp. ¶ 8.  On April 24, 2017, Orellana's bail was posted by his cousin.  Tr. at 213:15–214:24, 220:24–221:4, 478:3–11.  However, instead of being released, Orellana was detained by the SCSO pursuant to the ICE detainer and corresponding administrative warrant.  *See* Tr. at 478:12–20.  On April 26, 2017, ICE assumed custody of Orellana.  Tr. at 220:17–23, 482:1–2.

On July 2, 2017, class representative German Hernandez Argueta ("Hernandez," together with Orellana, "Plaintiffs") was arrested by the SCPD on a charge of false personation and subsequently remanded to the custody of the SCSO.  *See* Tr. at 728:2–8, 741:9–12; Defs. Stmt. ¶ 4; Pls. Resp. ¶ 4; Pls. Stmt. ¶¶ 35–36; Defs. Resp. ¶¶ 35–36.  On July 7, 2017, ICE issued a detainer and accompanying I-200 administrative warrant for Hernandez.  Defs. Stmt. ¶ 5; Pls. Resp. ¶ 5.  On August 18, 2017, Hernandez pled guilty to a disorderly conduct violation and was sentenced to time served.  *See* Tr. at 739:5–740:2; Defs. Stmt. ¶ 6; Pls. Resp. ¶ 6.  Despite receiving a sentence of time served, Hernandez was detained by the SCSO until later the same

---

[3] Exhibit page pincites refer to the last three digits of the Bates stamp for the exhibit.

evening, at which time he was transferred to ICE custody. Tr. at 739:21–740:16; Defs. Stmt. ¶ 6; Pls. Resp. ¶ 6. On January 23, 2018, Hernandez was released on bond from ICE custody. Pls. Stmt. ¶ 41; Defs. Resp. ¶ 41.

On March 9, 2018, Hernandez was again arrested by officers of the SCPD on charges of false personation and criminal possession of a weapon. Pls. Stmt. ¶ 42; Defs. Resp. ¶ 42. Hernandez was taken into SCSO custody on March 10, 2018. Pls. Stmt. ¶ 43; Defs. Resp. ¶ 43. On March 10, 2018, ICE issued a detainer request for Hernandez. Tr. at 268:6–269:18; Pls. Ex. 46B; Pls. Stmt. ¶ 44; Defs. Resp. ¶ 44. On March 30, 2018, Hernandez agreed to a plea of one day's adjournment in contemplation of dismissal. Tr. at 285:4–287:6; Pls. Stmt. ¶ 46; Defs. Resp. ¶ 46. The SCSO sent a memorandum to ICE stating, as of March 30, 2018, Hernandez was being held solely on account of the ICE detainer and was no longer facing charges in Suffolk County. Pls. Stmt. ¶ 47; Defs. Resp. ¶ 47. Despite his plea, Hernandez remained in the custody of the SCSO until April 2, 2018, at which time he was transferred to ICE custody. Tr. at 728:15–17; Pls. Stmt. ¶¶ 47–49; Defs. Resp. ¶¶ 47–49, 56.

The SCSO did not serve the ICE detainer requests on Plaintiffs. *See* Trial Tr. at 174:6–15, 175:2–3, 270:14–272:3, 300:13–19; Pls. Stmt. ¶ 14; Defs. Resp. ¶ 14. Further, the SCSO did not take any steps to notify Plaintiffs of the detainer requests lodged against them. *See* Tr. at 174:6–15, 175:2–3, 270:14–272:3, 478:24–479:10; Pls. Stmt. ¶ 15; Defs. Stmt. ¶ 15. The certificate of service on the detainer requests issued for both Orellana and Hernandez, which were to be filled out by the SCSO after serving the documents on Plaintiffs, were left blank. Tr. at 270:21–271:8, 290:2–292:6, 293:2–5, 300:13–19; Pls. Stmt. ¶¶ 28, 38, 45; Defs. Resp. ¶¶ 28, 38, 45. Per its policy at the time, the SCSO held Plaintiffs beyond the period they would otherwise be released based solely on the probable cause of removability pursuant to the detainer

4

requests with corresponding administrative warrants, as opposed to probable cause Plaintiffs committed a new crime. *See* Tr. at 203:6–23, 204:18–205:2, 206:1–207:4; Pls. Stmt. ¶ 18; Defs. Resp. ¶ 18.

### B.    Allegations

Plaintiffs represent a class of persons whom, between July 18, 2014 and November 15, 2018, were detained by the SCSO beyond the time they otherwise would have been released due to ICE detainer requests. *See* Class Cert. Order, ECF No. 143; R. & R. at 24, ECF No. 129. For this time period, Defendants produced over 670 inmate jackets[4] for individuals qualifying for class membership. Tr. at 340:8–341:9.

Plaintiffs alleged the "SCSO's policy of unquestioning compliance" with "'detainer' requests from the federal government agency Immigrations and Customs Enforcement" violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the U.S. Constitution and the First Article of the New York State Constitution. Sec. Am. Compl. ¶ 1, ECF No. 37. In addition to these constitutional claims, Hernandez sought—on his behalf and on behalf of similarly situated individuals—declaratory and injunctive relief under the Administrative Procedures Act, 5 U.S.C. § 706(a), and under the Fourth and Tenth Amendments of the U.S. Constitution. *Id.* ¶ 7.

### C.    Procedural History

On July 18, 2017, Orellana filed his initial complaint, naming as defendants (1) the DHS; (2) John F. Kelly, then-Secretary of the DHS, in his official capacity; (3) Elaine C. Duke, then-Deputy Secretary of the DHS, in her official capacity; (4) ICE; (5) Thomas D. Homan, then-Acting Director of ICE, in his official capacity; (6) Matthew T. Albence, then-Executive Associate Director of ICE, in his official capacity; (7) the County of Suffolk; (8) Steven Bellone,

---

[4] An inmate's "jacket" refers to an inmate's file containing papers related to the inmate's arrest, detention, and discharge. *See* Tr. at 231:2–5, ECF No. 302-3; Pls. Mot. for Class Cert. at 8 n.4, ECF No. 114-1.

then-County Executive for the County of Suffolk, in his official capacity; (9) the SCSO; and (10) Vincent F. DeMarco, then-Sheriff of the SCSO, in his official capacity. Compl., ECF No. 1.

On August 18, 2017, Orellana filed an amended complaint in which Hernandez was added as a plaintiff, and the titles and names of certain defendants were altered. ECF Nos. 12–13. Hernandez also filed a petition for a writ of habeas corpus. *Id.*

On January 2, 2018, the action was dismissed without prejudice with respect to the federal defendants. ECF No. 30.

On May 9, 2018, Plaintiffs filed the now-operative second amended complaint against (1) the County of Suffolk; (2) Steven Bellone, then-County Executive for the County of Suffolk, in his official capacity; (3) the SCSO; and (4) Errol Toulon, Jr., Sheriff of the SCSO, in his official capacity. Sec. Am. Compl., ECF No. 37.

On May 8, 2020, Defendants filed a fully briefed motion to dismiss the second amended complaint, which Plaintiffs opposed. ECF Nos. 84, 84-11.

On January 19, 2021, Chief Judge Roslynn R. Mauskopf ordered the motion to dismiss held in abeyance pending reassignment to a new District Judge. Jan. 19, 2021 Order. The case was reassigned to this Court the same day. *Id.*

On July 30, 2021, Plaintiffs filed a fully briefed motion to certify a class, ECF Nos. 98, 100, 101, which Defendants opposed, ECF No. 99.

On November 12, 2021, the parties filed cross-motions for summary judgment. ECF Nos. 113, 114. They filed their respective oppositions to the summary judgment motions the same day. ECF Nos. 115, 116.

6

On May 9, 2022, the Court denied both motions for summary judgment, without opinion and without prejudice, with leave to renew. ECF No. 123. The Court reaffirmed its denial on May 12, 2022. ECF No. 125.

On August 31, 2022, Magistrate Judge Arlene R. Lindsay issued a Report and Recommendation (the "R&R") in which she recommended granting Plaintiffs' motion for class certification with slight modification. R. & R., ECF No. 129. On September 14, 2022, Defendants timely filed objections to the R&R. ECF No. 130. On September 27, 2022, Plaintiffs filed a response in opposition to Defendants' objections to the R&R. ECF No. 132.

Following oral argument on July 1, 2024, the Court adopted Magistrate Judge Lindsay's R&R, which certified the class, and directed the parties to re-file their cross-motions for summary judgment. ECF No. 143.

On October 23, 2024, Plaintiffs re-filed a fully briefed cross-motion for summary judgment, ECF No. 150, which Defendants opposed, ECF No. 152. On December 6, 2024, Defendants re-filed a fully briefed cross-motion for summary judgment, ECF No. 160, which Plaintiffs opposed, ECF No. 161. On January 2, 2025, the Court granted in part and denied in part the parties' respective cross-motions for summary judgment. ECF No. 166 (the "SJ Order"). The Court granted Plaintiffs' motion on their state law claim under the First Article of the New York Constitution and their Fourth Amendment claim under the U.S. Constitution.[5] *Id.* at 26, 31.

---

[5] Relevant to the Court's summary judgment decision was the absence of a Section 287(g) cooperation agreement between Defendants and the federal government as permitted under 8 U.S.C. § 1357. SJ Order at 24–25, 30–31. The Court, applying the decision in *People ex rel. Wells v. DeMarco*, 168 A.D.3d 31 (N.Y. App. Div. 2d Dep't 2018), found New York state law did not permit the SCSO to make the arrests at issue in this case, particularly given the absence of a Section 287(g) agreement. SJ Order at 26. The Court also found the absence of a Section 287(g) agreement meant the SCSO had no reasonable belief or probable cause to make the arrests at issue, thus violating the Fourth Amendment of the U.S. Constitution. *Id.* at 31. The Court notes New York state recently adopted provisions prohibiting local law enforcement from entering into Section 287(g) agreements with the federal government. *See SFY 2026–27 Adopted*

The Court granted Defendants' motion on the substantive due process aspect of Plaintiffs' Fourteenth Amendment claim under the U.S. Constitution. *Id.* at 32. The Court otherwise denied the parties' respective motions for summary judgment. *Id.* at 34.

On January 16, 2025, Defendants filed a motion for reconsideration or for certification for appeal regarding the Court's decision and order on the parties' respective summary judgment motions. ECF No. 167. The Court denied Defendants' motion the same day it was filed. Jan. 16, 2025 Order.

On February 11, 2025, Defendants appealed the Court's summary judgment decision, ECF No. 171, which the U.S. Court of Appeals for the Second Circuit dismissed on June 16, 2025, ECF No. 182-1.

On July 25, 2025, Defendants filed a fully briefed motion to dismiss arguing sovereign immunity barred Plaintiffs' claims. ECF No. 189. Plaintiffs opposed the motion. ECF No. 194. On September 29, 2025, the Court denied Defendants' motion to dismiss on sovereign immunity grounds.[6] ECF No. 210.

On September 30, 2025, Defendants appealed the Court's sovereign immunity decision, ECF No. 211, which the Second Circuit dismissed on October 31, 2025, with the Mandate issued on December 31, 2025. ECF No. 307.

---

*Budget Report*, N.Y. State Senate, at 54 (May 27, 2026), https://www.nysenate.gov/new-york-state-budget.

[6] The Court's opinion was based on it finding Defendants waived a sovereign immunity defense by failing to raise it until the reply brief in support of their motion for summary judgment. Order at 11, ECF No. 210. Because the Court did not reach the merits of Defendants' sovereign immunity argument, it did not analyze the impact of the Supreme Court's recent decision in *Galette v. New Jersey Transit Corp.*, 24-1021, 24-1113, 146 S.Ct. 854 (Mar. 4, 2026) (finding the New Jersey Transit Corporation was not an arm of New Jersey entitled to sovereign immunity after discussing certain cases holding counties were not entitled to sovereign immunity).

8

The Court held trial in this case between November 3, 2025, and November 7, 2025. *See* Nov. 3, 2025 Min. Entry; Nov. 10, 2025 Min. Entry. The jury returned a unanimous verdict finding Defendants liable on Plaintiffs' procedural due process claim. ECF Nos. 287, 290. The jury found in favor of Plaintiffs in the amount of $75,000,000.00 for the Fourth Amendment and New York state law claims, and in the amount of $37,000,000.00 for the Fourteenth Amendment procedural due process claim. *Id.*

On December 8, 2025, Defendants posted a supersedeas bond in the amount of $125,000,000.00 in contemplation of an appeal to the Second Circuit of the trial verdict and judgment. ECF No. 301.

On December 10, 2025, Defendants filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), a motion to set aside the verdict for a new trial or remitter under Rule 59, and a motion to decertify the class (the "Defs. Mot." or "Motion"). ECF No. 302. On December 11, 2025, the Court set a briefing schedule as to the Motion and scheduled oral argument. ECF No. 303. On January 30, 2026, Plaintiffs filed their opposition to the Motion (the "Pls. Opp'n" or "Opposition"). ECF No. 309. On February 27, 2026, Defendants filed their reply to the Opposition (the "Defs. Reply" or "Reply"). ECF No. 311. On March 31, 2026, the Court heard arguments on the Motion. *See* Mar. 31, 2026 Min. Entry.

## II.    DEFENDANTS' POST-TRIAL MOTIONS

The Motion seeks judgment as a matter of law,[7] a new trial or remittitur, and decertification of the plaintiff class. Defs. Mot. at 12, 15, 21, 32.

First, on Plaintiffs' procedural due process claim, Defendants move for judgment as a matter of law pursuant to Rule 50(b). *Id.* at 12. Defendants argue the jury's verdict was wholly

---

[7] Defendants' motion for judgment as a matter of law is a renewed motion under Rule 50(b) because, during trial, Defendants twice moved for judgment as a matter of law. Tr. at 521:18–528:1, 749:10–12.

unsupported by the evidence presented at trial. *Id.* In support of this argument, Defendants claim it is undisputed inmates had both (1) actual notice of the ICE detainers, which serves as a complete defense to a procedural due process claim; and (2) ample opportunity to challenge their detentions, and did so. *Id.* at 12–14.

Second, pursuant to Rule 59, Defendants move for a new trial on liability if the Court denies its Rule 50(b) motion. *Id.* at 15–21. Defendants argue the Court erroneously: (1) excluded certain pleadings; (2) excluded evidence of Defendants' good faith; (3) excluded the specifics of Plaintiffs' criminal histories; (4) failed to instruct the jury on actual notice; and (5) instructed the jury a hearing should be held before a detainer. *Id.* at 15–21.

Third, pursuant to Rule 59, Defendants move for a new trial on damages or for remittitur. *Id.* at 21. Defendants argue: (1) the jury's award was against the weight of the evidence; (2) the Court erroneously allowed Plaintiffs to request a specific dollar amount of damages; (3) the Court erroneously admitted testimony from Plaintiffs' expert; (4) the Court erroneously instructed the jury Plaintiffs were entitled to damages for loss of liberty without providing legal limits; (5) the Court erroneously instructed the jury mental and emotional distress damages were available to Plaintiffs for denial of due process; and (6) the damages award was obviously excessive. *Id.* at 21–32.

Finally, Defendants move to decertify the plaintiff class, arguing: (1) the adopted R&R did not consider a procedural due process class; (2) the class lacks commonality; and (3) the class lacks typicality. *Id.* at 32–33.

The Court has carefully reviewed the arguments made by each party. For the reasons discussed herein, Defendants' Motion fails on all grounds.

10

## III.    MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.    Applicable Law Under Federal Rule of Civil Procedure 50

Pursuant to Rule 50(a)(1), the Court may grant a motion for judgment as a matter of law in a jury trial only if a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party" opposing the request.  Fed R. Civ. P. 50(a)(1); *Ortiz v. Stambach*, 137 F.4th 48, 60 (2d Cir. 2025) (Leval, Raggi, & Bianco, JJ.).

In deciding whether to grant judgment as a matter of law, the Court "must draw all reasonable inferences in favor of the nonmoving party . . . [and] although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Ortiz*, 137 F.4th at 61 (internal quotation marks and citation omitted) (alteration in original).  Importantly, the Court "may not itself weigh credibility or otherwise consider the weight of the evidence"; instead "it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Id.* (internal quotation marks and citation omitted).  "Thus, a court may not grant judgment as a matter of law unless: (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* (internal quotation marks and citation omitted).

### B.    Analysis

Defendants argue "Plaintiffs' procedural due process claim was belied by the undisputed fact that Plaintiffs had constitutionally sufficient *actual notice*" and by "unrebutted evidence that

11

inmates held on ICE detainers and warrants had ample opportunity to challenge their detention[.]" Defs. Mot. at 12 (emphasis in original).

As an initial matter, Defendants' statement of the law is inexact regarding the protections afforded by the Fourteenth Amendment. Defendants state "[t]here can be no procedural due process claim when the plaintiff has received actual notice." *Id.* (collecting cases). In some factual circumstances, actual notice can satisfy the notice requirement under the Fourteenth Amendment. *See Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995) (Graafeiland, Jacobs, & Cabranes, JJ.). However, Defendants' statement of the law glosses over the second and equally important requirement that an individual be given an "opportunity to be heard at a meaningful time and in a meaningful manner[.]" *Calhoun v. New York State Div. of Parole Officers*, 999 F.2d 647, 653 (2d Cir. 1993) (Timbers, Kearse, & Pratt, JJ.) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)) (internal quotation marks omitted).

Indeed, due process requires "notice *and* the opportunity to be heard." *Interboro Inst., Inc. v. Foley*, 985 F.2d 90, 93 (2d Cir. 1993) (Newman, Winter, & Mahoney, JJ.) (emphasis added and internal citation omitted) (analyzing whether an opportunity to be heard was afforded notwithstanding receipt of adequate notice). Said otherwise, it is insufficient for adequate notice to be given while a meaningful opportunity to be heard is lacking. Vice versa, it is insufficient to afford a meaningful opportunity to be heard while adequate notice is absent. Having clarified the applicable law, the Court finds the trial record provided a legally sufficient evidentiary basis for a reasonable jury to find in favor of Plaintiffs regarding their procedural due process claim.[8]

---

[8] Defendants do not dispute Plaintiffs were deprived of a liberty interest due to their detention. *See generally* Defs. Mot.

12

### 1.    *Actual notice*

At trial, Plaintiffs presented sufficient evidence for a reasonable jury to find adequate notice was not given to inmates regarding the ICE detainers lodged against them. Orellana testified to the circumstances of his detention in April 2017. He noted his cousin paid Orellana's bail for underlying state charges on April 24, 2017, but the SCSO continued to hold him in the Suffolk County jail for two additional nights. Tr. at 477:12–478:11, 479:11–13. Orellana explicitly testified he was not told why the SCSO continued to hold him. *Id.* at 478:24–479:1. No one told Orellana how much longer he would be detained. *Id.* at 479:2–7. In Orellana's own words, "[t]hey never told me anything." *Id.* at 479:2–7.

Orellana's testimony was corroborated by documentary evidence. Indeed, the jury saw Orellana's April 2017 ICE detainer. *See* Tr. at 289:21–290:7. The certificate of service for Orellana's detainer was left blank, *see* Pls. Ex. 50B at 001; Tr. at 290:19–292:6, despite the following plain instruction written on the face of the detainer in all capital and bolded letters: **"TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE ALIEN WHO IS THE SUBJECT OF THIS NOTICE[.]"** Pls. Ex. 50B at 001. Similarly, the jury saw the administrative warrant issued for Orellana's arrest, which also had a blank certificate of service. *Id.* at 002.

Hernandez recounted the same experience with respect to his second detention by the SCSO in March 2018. He testified SCSO officers did not give him any papers from immigration. Tr. at 741:13–16. And although Hernandez testified an ICE agent later gave him papers, there was no indication as to the exact date these documents were given to him or whether the documents consisted of the ICE detainer or administrative warrant lodged against

13

him. *See id.* at 741:13–25. Like Orellana's ICE detainer, Hernandez's March 2018 detainer had a blank certificate of service. Pls. Ex. 46B at 001; Tr. at 269:20–271:8.

Moreover, SCSO officers themselves testified they did not serve ICE detainers on inmates or take steps to ensure others served the detainers. Sergeant Robert Hennigan, an SCSO officer who worked in the SCSO records room, testified he did not personally notify detainees they were subject to ICE detainers. Tr. at 301:8–10. To Sergeant Hennigan's knowledge, no action was taken by the SCSO to ensure the certificate of service for ICE detainers was completed. *Id.* at 303:23–304:19. Mark McCarthy, a retired SCSO lieutenant, agreed it "was the [SCSO's] policy not to make any effort to make sure that . . . ICE detainers were served on any individuals[.]" *Id.* at 520:5–9. Instead, Lieutenant McCarthy noted the SCSO merely *assumed* ICE was serving detainers on inmates. *See id.* at 517:25–518:10 (emphasis added). The former SCSO sheriff himself stated it was not the SCSO's job to serve administrative warrants or detainers. *Id.* at 562:17–23, 586:14–20 ("ICE would do all the work that had to do with detainers . . . [s]o we did not do this stuff.").

Defendants attempt to undermine this evidence by first emphasizing Hernandez's testimony.[9] It is true Hernandez stated ICE notified him of the detainer and warrant for his August 2017 detention. Defs. Mot. at 13 (citing Tr. at 730:1–18). However, this testimony—at most—establishes Hernandez had actual notice for his August 2017 detention. Conversely, the testimony does not establish Hernandez had actual notice for his March 2018 detention.

Defendants then argue the mere fact Orellana testified he received papers during his April 2017 detention and Hernandez stated he received papers during his March 2018 detention

---

[9] At trial, the parties agreed to designate and read Hernandez's deposition testimony into the record because he was an unavailable witness. *See* Tr. at 713:22–714:9. Thus, the "testimony" presented by Hernandez comes from statements made in his deposition.

conclusively establishes they were served their respective ICE detainers and warrants. Defs. Mot. at 13 (citing Tr. at 741:13–23, 481:2–7, 486:11–18). But, as noted above, Hernandez did not state the papers he received in March 2018 included the ICE detainer or warrant. *See* Tr. at 741:13–23. In fact, Hernandez explicitly testified he could not recall what kind of papers he received. *Id.* at 741:24–25. Similarly, Orellana never testified the papers presented to him for signature were the ICE detainer and warrant.[10] *See id.* at 486:11–18. And to the extent Defendants complain of Orellana's memory recall at trial, this was a matter for the jury to weigh when considering the other testimony given by Orellana and SCSO officers, as well as the documentary evidence, such as the blank certificates of service. *See* Jury Instructions at 14–15, ECF No. 288-1 (instructing the jury to consider the accuracy of a witness' memory when evaluating their testimony).

Finally, Defendants highlight their witnesses testified ICE was responsible for serving—and did serve—the detainers and warrants. Defs. Mot. at 13–14. However, at most, this testimony clashed with the weight of other evidence given at trial, including the speculative nature of Sergeant Hannigan's, Lieutenant McCarthy's, and the former sheriff's testimony. *See, e.g.*, Tr. at 519:19–21 ("We *assumed* ICE was taking care of that."(emphasis added)). The jury was entitled to weigh the competing evidence as the ultimate triers of fact, and draw any reasonable inferences available to them, including whether certain testimony or documentary evidence was more credible, likely, or speculative.

---

[10] Plaintiffs argue the question of whether ICE detainers were served on inmates was determined at the summary judgment stage, binding Defendants at the post-trial stage. Pls. Opp'n at 5–6 (arguing "law of the case" applies). This argument fails because as the Supreme Court held in *Dupree v. Younger*, "[t]rials wholly supplant pretrial factual rulings, but they leave pretrial legal rulings undisturbed." *See Dupree v. Younger*, 598 U.S. 729, 735–36 (2023) ("[A] district court's factual rulings based on the obsolete summary-judgment record are useless.").

15

Taken together, a reasonable jury would have a legally sufficient evidentiary basis to find Plaintiffs and the other class members lacked actual notice.

### 2.    *Opportunity to be heard*

Next, Defendants attack the sufficiency of the evidence regarding whether Plaintiffs were given an opportunity to be heard about their detentions. Defs. Mot. at 14–15. The Court finds there was sufficient evidence for a reasonable jury to conclude the class members were not afforded a meaningful opportunity to be heard.

A "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation marks and citations omitted). Of course, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (internal quotation marks and citation omitted).

Defendants point to Hernandez's habeas petition—filed on the day he would have otherwise been released from SCSO custody absent the 2017 ICE detainer—as proof he had the opportunity to challenge his detention and did so. Defs. Mot. at 14–15. However, Hernandez's ability to challenge his earlier detention in August 2017 does not mean he was able to do so for his second detention in March 2018. Second, whether Hernandez filed a habeas petition for his first detention does not necessarily have a bearing on whether other inmates, such as Orellana, had the opportunity to challenge their detentions. The jury certainly could have weighed this evidence against the rest of the trial record and ultimately concluded an opportunity to be heard was not afforded to all class members for every one of their detentions.

Similarly, Defendants point to Orellana's proceedings in Immigration Court as proof he was able to challenge his detention. Defs. Mot. at 14. However, the only record citation Defendants provide is an Immigration Court order dated October 17, 2017—nearly *five months*

16

*after* Orellana's extended detention. *See id.* (citing Defs. Ex. 56). Additionally, Orellana testified at trial he was not told anything about whether he could fight his detention. Tr. at 479:2–7.

Defendants' other arguments on this issue are equally unpersuasive. Defendants argue multiple avenues were available to Plaintiffs and the class members to challenge their detentions, including phone calls to attorneys, the availability of the Legal Aid hotline, accommodated meetings with lawyers in the jail, the Inmate Handbook purportedly setting forth procedures to lodge complaints, and the ICE detainers themselves. *Id.*

With respect to the availability of phones, Orellana testified he "was not able to use them." *Id.* at 487:24–488:2. As for the ICE detainers—which Defendants argue provided information to detainees about how to challenge their detentions—the jury certainly could have found the detainers were never given to Plaintiffs or the class members, as discussed above. *See supra* § III.B.1. Indeed, testimony indicated the second and third pages of the ICE detainers—which had translated information about what the detainers meant and how to challenge them—were not given to Plaintiffs or the class members. *See* Tr. at 237:23–238:10 (testimony noting second and third pages were not regularly kept in record rooms or otherwise served by the SCSO); *id.* at 238:5–10 ("We had nothing to do with giving them [the second and third pages]").

As for the Inmate Handbook, Legal Aid hotline, and meetings with lawyers,[11] there was evidence supporting Orellana and other class members were never told about these tools, let alone in a language they understood. Again, Orellana testified he was not told anything about

---

[11] Defendants note Orellana testified he was represented by counsel in his immigration proceedings. Defs. Mot. at 15 (citing Tr. at 502:10–12). However, the cited portion of the transcript does not note when Orellana engaged this counsel and so it does not shed light on whether Orellana had an opportunity to challenge his detention anywhere near the time it occurred. *See* Tr. at 502:10–12.

17

whether he could fight his detention. Tr. at 479:2–7. Although Hernandez testified he received the Inmate Handbook in Spanish,[12] *id.* at 736:4–10, it is quite possible other inmates did not receive the same.

This is especially so given testimony from Lieutenant Michael Ervolino, an employee of the SCSO, who testified about the ad hoc process when a non-English speaker was present: "[i]*f* there's not an officer that can speak Spanish they'll—*if* there's another inmate in the booking process, they'll have them translate or sometimes an inmate worker that may be cleaning or in the area, they'll call over to use them as a translator." *Id.* at 634:4–13 (emphasis added). In fact, this ad hoc process—in the eyes of the SCSO—was not for the benefit of the inmates. Lieutenant Ervolino stated, "the officer needs the translation, not necessarily the inmate." *Id.* at 682:10–23. Even the Booking Sheet—on which an inmate was meant to indicate they had received a telephone call and the Inmate Handbook—was not available in Spanish. *See id.* at 684:21–685:7.

For these reasons, the Court finds there was a legally sufficient evidentiary basis for a reasonable jury to find the class members lacked a meaningful opportunity to be heard with respect to their extended detentions.

## IV. MOTION FOR A NEW TRIAL ON LIABILITY

### A. Applicable Law Under Federal Rule of Civil Procedure 59

Pursuant to Rule 59(a), the Court may grant a new trial on all or some issues only if it concludes "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of

---

[12] Even assuming the Inmate Handbook gave Hernandez an opportunity to be heard with respect to his extended detention, the jury's finding he did not have notice of his March 2018 detention suffices to uphold the finding of a procedural due process violation. *See supra* § III.B.

18

justice[.]" *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (Newman, Katzmann, & Raggi, JJ.) (internal quotation marks and citation omitted).

Motions for a new trial under Rule 59 are less stringent than those under Rule 50; a new trial may be granted "even if there is substantial evidence supporting the jury's verdict," and the Court is "free to weigh the evidence [itself], and need not view it in the light most favorable to the verdict winner[.]" *Id.* at 244–45 (internal citation omitted). Ultimately, the decision whether to grant a new trial is "committed to the sound discretion of the trial judge." *Crews v. County of Nassau*, 149 F. Supp. 3d 287, 292 (E.D.N.Y. 2015) (Bianco, J.) (internal quotation marks and citation omitted). Grounds for granting a new trial include verdicts against the weight of the evidence, substantial errors in the admission or rejection of evidence, and non-harmless errors in jury instructions. *See Jackson v. Tellado*, 295 F. Supp. 3d 164, 181 (E.D.N.Y. 2018) (Chen, J.) (collecting cases).

**B.    Analysis**

As an alternative to entering judgment as a matter of law in their favor, Defendants urge the Court to grant a new trial. Defendants argue a new trial is justified because the Court erred at trial by: (1) excluding certain pleadings, evidence of Defendants good faith, and Plaintiffs' criminal histories; (2) failing to instruct the jury on actual notice; and (3) instructing the jury a hearing should be held before a detainer, as opposed to after. Defs. Mot. at 15–21. For the reasons discussed below, the Court finds its prior rulings were not erroneous and, even if they were, would constitute harmless error.

1.    *Exclusion of pleadings*[13]

First, Defendants argue this Court's decision excluding the First Amended Complaint (the "FAC") and Second Amended Complaint (the "SAC") was error. *Id.* at 15–17.

Such a decision is within the broad discretion of the Court. *See Ferrante v. Metro-North Commuter R.R.*, 06-CV-4447, 2007 WL 1793447, at *1 (S.D.N.Y. June 18, 2007) (Leisure, J.) (citing *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1193 (2d Cir. 1989) (Oakes, Kearse, & Cardamone, JJ.)). As the Court explained at trial, the risk of unduly confusing the jury or otherwise injecting undue prejudice into the jurors' deliberations and understanding of the case animated its decision to exclude the pleadings pursuant to Federal Rule of Evidence 403. *See* Tr. at 716:6–19. Other courts in this circuit have recognized there is no express rule requiring the admission of pleadings in every case. *See, e.g., Gov't Empls. Ins. Co. v. Strut*, 758 F. Supp. 3d 140, 146 (S.D.N.Y. 2024) (McCarthy, M.J.) (internal citations omitted); *see also Prophete v. Acevedo-Smith*, 788 F. Supp. 3d 345, 361 (E.D.N.Y. 2025) (Matsumoto, J.).

To bolster their argument, Defendants cite *Andrews v. Metro North Commuter R. Co.*, in which the Second Circuit held it was an abuse of discretion for the district court to have refused to permit the original complaint to be received in evidence. 882 F.2d 705, 707 (2d Cir. 1989) (Graafeiland, Meskill, & Winter, JJ.). However, *Andrews* involved different factual circumstances from the current case. The Second Circuit noted "a vague feeling of unease" and "puzzlement" at the amended complaint in *Andrews*, which added a "new and markedly different cause of action" at the late stage of an already prolonged litigation. *Id.* at 706–07. By contrast, the FAC and SAC in this case did not add a wholly new theory of substantive liability. *See*

---

[13] The Court's reasoning extends to the decision to exclude Hernandez's brief in support of his habeas corpus petition and Orellana's motion to terminate proceedings in Immigration Court. *See* Defs. Mot. at 17 n.3.

20

*generally* First Am. Compl., ECF No. 12; Sec. Am. Compl. In any event, *Andrews* did not set a steadfast rule requiring the admission of any and all pleadings regardless of the circumstances. *See generally Andrews*, 882 F.2d 705.

Even assuming, *arguendo*, it was error for the Court to exclude the FAC and SAC, it was harmless. Defendants focus on the fact Hernandez was unable to testify at trial, which purportedly exacerbated the prejudice resulting from the Court's refusal to admit the pleadings. *See* Defs. Mot. at 16. However, the Court allowed Defendants to introduce portions of the pleadings' allegations by reading portions of Hernandez's deposition—covering certain paragraphs of the allegations—into the record. *See* Tr. at 603:4–8 (noting counsel was able to question witnesses regarding documents without admitting the documents themselves); *id.* at 729:2–730:17 (reading portions of allegations into trial record). Moreover, the Court admitted stipulations to the jury, noting: (1) Plaintiffs filed the FAC on August 18, 2017; (2) a habeas corpus petition was filed on Hernandez's behalf the same day; and (3) immigration relief was granted to Hernandez on July 17, 2023. *Id.* at 724:19–25. The Court cannot say the exclusion of the pleadings had any impact, let alone a significant one, on the jurors' ultimate verdict.

2. *Exclusion of evidence of Defendants' good faith*

Next, Defendants argue it was error for the Court to "preclude[e] . . . evidence of their good faith belief, based in part on the advice of counsel, that [the] SCSO's detainer policy complied with the law." Defs. Mot. at 17.

Defendants' argument on this point is vague and underdeveloped. Defendants cite the *Mathews* balancing test to argue their "good faith belief in the lawfulness of the detainer policy reduces the probable value, if any, of additional or substitute procedural safeguards . . . because further opportunities to contest the lawfulness of their detention would not have provided a

21

different outcome or affected Plaintiffs' loss of liberty." *Id.* However, Defendants do not explain what bearing good faith has on the deficient procedural protections afforded to Plaintiffs and other class members.

Good faith or bad faith, the lack of notice and a meaningful opportunity to be heard kept Plaintiffs in the dark about why their liberty was restricted and how they could challenge it. As this Court previously ruled, evidence of Defendants' good faith is irrelevant and unduly prejudicial pursuant to Rules 402 and 403 of the Federal Rules of Evidence. Order, ECF No. 266. *Warren v. Pataki,* which Defendants cite, did not discuss the impact of good faith on a procedural due process claim. *See* 823 F.3d 125 (2d Cir. 2016) (Sack, Hall, & Carney, JJ.). Defendants, in conclusory fashion, state their purported good faith somehow means "giving Class Members further opportunities to challenge their detentions would not have produced a different outcome." Defs. Reply at 5. But there is no explanation as to why the outcome would not have been different for Plaintiffs and class members assuming Defendants acted in good faith. Other than *Warren,* Defendants offer no caselaw support for their proposition.

Nor did Plaintiffs open the door to admission of such evidence as Defendants claim. Defs. Mot. at 18. The portion of the trial record Defendants cite makes no mention of bad faith or good faith. *See id.* (citing Tr. 127:19–128:1, 125:9–22, 131:10–23). At most, Plaintiffs noted the procedural impetus for Defendants extending inmates' detentions i.e., the ICE detainers. *See* Tr. at 125. Moreover, at trial Defendants flouted the Court's pre-trial order excluding evidence of good faith and introduced evidence of the SCSO's reliance on the advice of counsel in connection with the decision to change policies. *See, e.g.,* Tr. at 543:9–24; 544:6–8. As this Court already explained, *see* ECF No 266, such evidence was improper and its exclusion at trial

22

did not constitute error. Even if the Court's decision was error, the fact Defendants elicited good faith evidence makes any such error harmless.

### 3.    *Exclusion of Plaintiffs' criminal histories*

Defendants also complain of the Court's decision to exclude the "specifics of, or reasons for, any prior arrests or periods of incarceration" Plaintiffs underwent in the past. Defs. Mot. at 18. Specifically, Defendants argue information regarding Plaintiffs' criminal histories is "particularly relevant here . . . to determining the extent of the harm a plaintiff suffers by a subsequent loss of liberty." *Id.*

The Court agrees an individual's prior incarceration may have an impact on the distress and damages a plaintiff may recover. *See, e.g., Banushi v. Palmer*, 08-CV-2937, 2011 WL 13894, at *3 (E.D.N.Y. Jan. 4, 2011) (Matsumoto, J.). This is exactly why this Court's pre-trial order allowed Defendants to specifically inquire about: "(1) whether Class Plaintiffs had been arrested before the underlying incident; (2) whether they had been incarcerated before the underlying incident; and, (3) if so, how long such prior period of incarceration lasted." Order at 1, ECF No. 256. The Court barred inquiry into the reason for any prior arrest or period of incarceration because such information could be unduly prejudicial and misleading to the jury when the relevance of any information is limited to the amount of distress Plaintiffs were accustomed to as a result of past detentions. In fact, *Banushi*, which Defendants cite in support of their argument, expressly precluded "inquir[y] into the reasons for plaintiff's prior arrests" just as the Court did here. 2011 WL 13894, at *3. Defendants effectively complain they were not given carte blanche to question Plaintiffs about any and all prejudicial information regarding their criminal histories. It was not error for the Court to deny Defendants the opportunity to do so.

23

*4.     Jury instructions regarding actual notice*

Defendants next argue the Court erred by failing to instruct the jury on actual notice. Defs. Mot. at 19. Defendants argue the following portion of the jury instructions was inadequate:

> It is your role as the jury to decide if defendants provided enough notice and opportunity to class plaintiffs to adequately dispute their unlawful detentions. If your answer is yes, then you must find for the defendants on the claim. If your answer is no, then you must find for the class plaintiffs on their procedural due process claim.

*Id.*; *see also* Jury Instructions at 19.

As an initial matter, none of the cases Defendants cite deal with an actual notice defense or related instructions on actual notice. *See* Defs. Mot. at 19–20 (collecting cases).

More importantly, however, Defendants misread the jury instructions as failing to account for actual notice. Defendants seem to believe including the phrase "actual notice" as opposed to "enough notice" would have been necessary to correctly apprise the jury of the applicable law. The Court disagrees. The Court's instructions stated it was the role of the jury to decide if "enough notice and opportunity" was given to Plaintiffs and the class members. Jury Instructions at 34. Necessarily included in this question is whether Plaintiffs and the class members were made aware, in one form or another, of the reason for their actual detention, i.e., whether they were given actual notice.

Defendants also argue the Court's jury instructions erroneously implied notice—whether actual or otherwise—had to be given by Defendants themselves as opposed to another party such as ICE. *See* Defs. Mot. at 20. Specifically, Defendants point to the following instruction: "It is your role as the jury to decide if defendants provided enough notice and opportunity to class plaintiffs to adequately dispute their unlawful detentions." *Id.*

24

However, the Court also instructed the jury as follows:

> In this case, class plaintiffs argue defendants did not provide them adequate due process by (1) not serving, or providing, the detainer requests issued by Immigration and Customs Enforcement to class plaintiffs prior to continuing class plaintiffs' detention, **or otherwise ensuring the detainer requests issued by Immigration and Customs Enforcement were provided to class plaintiffs . . .**

Jury Instructions at 33–34 (emphasis added).

Given Defendants' theory of actual notice revolved around whether ICE gave the detainers to Plaintiffs and the class members, *see supra* § III.B.1, and the Court expressly instructed the jury about whether Defendants "otherwise ensure[d] the detainer requests" were provided to inmates (e.g., via delivery by another party), there was no error or undue implication Defendants themselves must have served the detainers or put Plaintiffs on notice. This conclusion is bolstered by the fact Defendants offered evidence at trial regarding whether ICE, instead of the SCSO, served the detainers on inmates and thereby provided sufficient notice. *See supra* at 15.

For these reasons, the Court's jury instructions regarding notice were not deficient.

### 5.    *Jury instructions regarding an opportunity to be heard*

Finally, Defendants argue the Court erred when instructing the jury as follows:

> [D]efendants must have provided class plaintiffs with constitutionally sufficient 'notice and opportunity for hearing' before depriving class plaintiffs of their liberty interests.

Defs. Mot. at 21; *see also* Jury Instructions at 33. Specifically, Defendants take issue with the word "before" being used to indicate post-deprivation hearings would not suffice. *Id.*

In *Cleveland Bd. of Educ. v. Loudermill*, the Supreme Court emphasized "the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." 470 U.S. 532, 542 (1985) (internal quotation

25

marks and citations omitted). This root requirement would logically extend to an individual's liberty interest. However, the Supreme Court also noted "[t]here are, of course, some situations in which a post[-]deprivation hearing will satisfy due process requirements." *Id.* n.7 (collecting cases). The Second Circuit, for example, has indicated a post-deprivation hearing may be sufficient when a pre-deprivation hearing would otherwise be "impracticable." *See Calhoun,* 999 F.2d at 653.

As Defendants note, the question of impracticability is fact-specific. Defs. Reply at 4–5. Defendants characterize this case as one where a pre-deprivation hearing was impracticable given the "detainer periods did not typically extend for more than a few hours or days." Defs. Mot. at 21; Defs. Reply at 4. Considering the facts in this case, Defendants fail to sufficiently explain why holding a pre-deprivation hearing would be impracticable. The obvious alternative to depriving Plaintiffs of a meaningful opportunity to be heard prior to their extended detention would be to release them, deliver notice of the ICE detainers, and offer said opportunity before re-arresting them.

Even assuming, *arguendo*, a pre-deprivation hearing would be impracticable, Defendants' argument fails because they offer no explanation of what post-deprivation hearing was sufficient or even afforded to the class members. Even if Orellana, Hernandez, or other class members had post-deprivation avenues to challenge their detentions (e.g., Immigration Court or habeas proceedings), Defendants fail to explain whether these post-deprivation hearings were timely held or sufficient to protect their procedural due process rights. *See VW Credit Leasing LTD. v. Runway Towing Corp.*, 757 F. Supp. 3d 271, 288 (E.D.N.Y. 2024) (Gonzalez, J.) ("[W]here a pre-deprivation hearing is impractical and a post-deprivation hearing *is meaningful*, the State

26

satisfies its constitutional obligations by providing the latter." (emphasis added) (quoting *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) (Graafeiland, Cardamone, & Bonsal, JJ.)).

At the end of the day, Defendants fail to sufficiently explain and support their argument this case is similar to *Calhoun*. *See* Def.'s Mot. at 21. Because Defendants (1) are entitled to a jury instruction only when it is "supported by evidence of probative value," *Boyle v. Revici*, 961 F.2d 1060, 1062 (2d Cir. 1992) (Meskill, Winter, & Walker, JJ.), and (2) have failed to make a showing with respect to the impracticability of a pre-deprivation hearing, or the sufficiency of a post-deprivation hearing, it was not error for the Court to give the instruction it did.

## V.   MOTION FOR A NEW TRIAL ON DAMAGES

### A.   Applicable Law Under Federal Rule of Civil Procedure 59

The same legal standard discussed with respect to Defendants' motion for a new trial regarding liability, *supra* § IV.A, applies to their motion for a new trial regarding damages.

### B.   Analysis

Defendants argue they are entitled to a new trial regarding damages because: (1) the jury's awards are against the weight of the evidence; (2) the Court made erroneous evidentiary decisions; and (3) the Court's jury instructions on damages were erroneous. Defs. Mot. at 21–22. The Court is unpersuaded by Defendant's arguments as discussed below.

#### 1.   *Sufficiency of the evidence regarding procedural due process injury*

First, Defendants argue Plaintiffs presented insufficient evidence of procedural due process damages, justifying a new trial. *Id.* at 21–24.

As the Supreme Court recognized in *Carey v. Piphus*, damages for Section 1983 claims— such as those involved in the case at hand—"should be tailored to the interests protected by the particular right in question . . ." 435 U.S. 247, 259 (1978). It is well-established "a purpose of

27

procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests." *See id.* at 262. Thus, in the context of the Due Process Clause, "the deprivation of protected interests without procedural due process . . . inevitably arouses strong feelings of mental and emotional distress in the individual who is denied" the feeling of just treatment by their government. *Id.* at 261. Nevertheless, damages for mental and emotional distress cannot be presumed, and so a plaintiff must adduce evidence of actual injury. *See id.* at 262–63.

Sufficient evidence was presented at trial to establish actual injury on behalf of the class members. Defendants seem to argue Orellana's testimony, as a plaintiff in this case, was insufficient standing alone to prove actual injury. *See* Defs. Mot. at 22–23 (citing *Annis v. Cnty. of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998) (Graafeiland, Cardamone, & McLaughlin, JJ.). However, this ignores the Second Circuit's decision in *Walz v. Town of Smithtown* which held the testimony of the plaintiffs were sufficient to establish damages based on emotional distress. 46 F.3d 162, 170 ("The jury was entitled to credit this testimony.") (Winter, Leval, & Skretny, JJ.). Orellana did not only testify he was "sad[,]" but he also described his feelings of desperation. *See* Tr. at 482:20, 483:14–15.

To the extent Defendants argue evidence of physical manifestations of distress are required to prove actual injury, Defs. Mot. at 22, this ignores the fact Orellana could not sleep nor eat as a result of the constitutional violation at issue—clear physical manifestations of the distress Defendants' actions inflicted upon him.[14] *See* Tr. at 483:14–15.

---

[14] Defendants' final argument on this point regarding Orellana's ability to recall certain details is unpersuasive for the reasons discussed above. *See supra* at 16–17.

2.    *Sufficiency of the evidence regarding loss of liberty injury*

Second, Defendants argue Plaintiffs failed to establish sufficient evidence of damages for their loss of liberty claims. Defs. Mot. at 23. Instead, Defendants believe nominal damages may have been appropriate. *See id.* (citing *Rentas v. Ruffin*, 816 F.3d 214, 223–24 (2d Cir. 2016) (Parker, Lohier, & Carney, JJ.)).

Defendant's reliance on *Rentas* is inapposite to this action. The Second Circuit's decision in *Rentas* was based on the conclusion that a "jury reasonably could have found that the loss of liberty was not caused by the defendants' alleged fabrication of evidence, but rather by whatever independent, untainted evidence supported probable cause." *See Rentas*, 816 F.3d at 224. In this case, as explained *infra*, there is no indication the class members' extended detentions would still have occurred absent Defendants' unconstitutional actions. *See infra* § V.B.3.

Defendants' argument also fails to account for the Second Circuit's decision in *Kerman v. City of New York*. Defendants cite *Kerman* for the proposition that "[a] finding that the plaintiff has been deprived of a constitutional right does not automatically entitle him to a substantial award of damages." Defs. Mot. at 23 (citing 374 F.3d 93, 123 (2d Cir. 2004) (Feinber, Kearse, & Raggi, JJ.)). Yet in the same case, the Second Circuit expressly stated, "where the plaintiff was indisputably deprived of his liberty, and the conduct of the defendant responsible for the deprivation was found to be unlawful . . . the plaintiff is entitled to compensatory, not merely nominal, damages." *Kerman*, 374 F.3d at 124 (internal citation omitted). Defendants failed to grapple with this clear statement of the law. *See generally* Defs. Mot.

Finally, the trial record, including Sean Kruskol's admissible testimony, *see infra* § V.B.6, clearly demonstrate Plaintiffs and the class members were deprived of their liberty when their detention in jail was extended beyond the time they would have otherwise been released.

29

Moreover, as the Court found, Defendants' actions in depriving the class members of this liberty interest were unlawful. For these reasons, the evidence was sufficient to establish loss of liberty damages.

### 3.   Sufficiency of the evidence regarding proximate causation

Third, Defendants argue there was insufficient evidence of proximate causation linking Defendants' unlawful actions to the class members' procedural due process and loss of liberty injuries. *See* Defs. Mot. at 23; Defs. Reply at 6; *see also Carey*, 435 U.S. at 255–59, 64 (applying causation requirement to proving damages under Section 1983). Defendants' argument is based on their contention there was "uncontroverted testimony that Plaintiffs could have been lawfully detained by ICE during the same period they were held by Defendants." Defs. Reply at 6 (citing Tr. 563:18-564:5). Defendants specifically cite to testimony by the former SCSO sheriff who agreed "ICE could lawfully arrest people the day they got out of custody[.]" *See id.*

With respect to procedural due process damages (i.e., mental and emotional distress) it is unclear why it would matter whether Plaintiffs could have been lawfully arrested by ICE during the period of their extended detentions. The mental and emotional distress stems from the lack of notice and a meaningful opportunity to be heard, which is a violation that does not turn on whether the initial arrest was lawful. *See* Tr. at 479–480 (Orellana linking his mental and emotional distress to the lack of procedural due process).

With respect to loss of liberty damages, it is wholly irrelevant whether Plaintiffs could have been lawfully arrested by ICE during the same period they were held by the SCSO, despite Defendant's contention to the contrary. Just because ICE *could* have detained Plaintiffs does not mean they *would* have. Thus, Defendants' argument does not change the causation analysis.

30

Because Defendants unlawfully detained Plaintiffs past the time they would have otherwise been released—based on the detainers ICE issued—Plaintiffs sufficiently established Defendants' actions caused their extended detention and thus their loss of liberty damages.

4.    *Procedural due process damages and loss of liberty damages are not duplicative*

Fourth, Defendants argue any procedural due process damages and loss of liberty damages awarded would be duplicative and violate the rule against double recovery for the same injury. Defs. Mot. at 24 (citing *Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 161 (E.D.N.Y. 2011) (Hurley, J.)).

Defendant's argument is based on assuming the only provable injury in this action was for loss of liberty. *See* Defs. Mot. at 23. Because the Court rejects this assumption, *see supra* §§ V.B.1, V.B.3, Defendants' argument fails.

Loss of liberty damages compensate class members for the loss of time and related injuries they suffered from their extended detentions, which is distinct from the procedural due process damages which compensate class members for the mental and emotional distress they suffered due to the lack of notice and a meaningful opportunity to be heard. *See United Realty Advisors, LP v. Verschleiser*, 2024 WL 4380274, at *1 (2d Cir. Oct. 3, 2024) (Raggi, Wesley, & Lohier, Jr., JJ.) ("[a] jury's award is not duplicative simply because it allocates damages under two distinct causes of action.").

5.    *Specific dollar amount requests*

Fifth, Defendants argue the Court erred in permitting Plaintiffs to ask for a specific dollar amount in damages. Defs. Mot. at 24. Defendants state the "unfair influence of the request is clear in the jury's award, which was clearly anchored by Plaintiffs' request." *Id.*

31

Although the Second Circuit has stated "specifying target amounts for the jury to award is disfavored[,]" *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1016 (2d Cir. 1995) (Newman, Altimari, & Leval, JJ.), *vacated on other grounds sub nom.*, 518 U.S. 1031 (1996), there is no *per se* prohibition on doing so, *see id.* ("[T]his court has not adopted a per se rule about the propriety of suggested damage amounts[.]" (internal citation omitted)).  Ultimately, the decision is left to the discretion of the district court. *See, e.g., Nunez v. Diedrick*, 14-CV-4182, 2017 WL 4350572, at *7 (S.D.N.Y. June 12, 2017) (Sullivan, J.).

Given the discretion left to district courts and the lack of a prohibition on allowing specific dollar amount requests, the Court did not err in allowing Plaintiffs to request a specific dollar amount in damages.  In fact, the Court limited the danger of undue prejudice by allowing a specific dollar amount request only after—and if—such a request was supported by admissible evidence.  Order at 1–2, ECF No. 259.

6.    *Admission of Kruskol's expert testimony*

a.    *Kruskol's direct testimony.*

Sixth, Defendants argue the Court erred in admitting the testimony of Plaintiffs' damages expert—Sean Kruskol—on direct examination.  Defs. Mot. at 25–26.

Defendants' attack on Kruskol's testimony is based on their argument he does not fit the criteria for a testifying expert under Rule 702 of the Federal Rules of Evidence.  *See* Defs. Mot. at 25.  Rule 702 permits the admission of expert testimony if it: (1) is provided by an individual who has scientific, technical, or other specialized knowledge; (2) is based on sufficient facts or data; (3) is the product of reliable principles and methods; (4) reflects a reliable application of the principles and methods to the facts of the case; and (5) helps the trier of fact understand the evidence or determine a fact in issue.  *See* Fed R. Evid. 702.

32

Kruskol satisfied these requirements. At trial, Kruskol testified about his technical and specialized knowledge as a forensic accountant consultant engaged in "damage analysis" and "technical accounting-type of issues" for approximately twenty years. Tr. at 330:16–332:13. Additionally, Kruskol holds an undergraduate degree in accounting and a "Masters of Accountancy[.]" *Id.* at 331:8–13. Furthermore, he testified with respect to his experience "analyz[ing] large datasets and compliance matters in disputes such as [the instant case], tax disputes, [and] damages matters." *Id.* at 332:8–10.

Kruskol also relied on sufficient facts or data to support his testimony. He reviewed approximately 674 inmate jackets, totaling between 10,000 to 15,000 pages. *Id.* at 340:8–10. These key data points included bail and fine receipts, warrant checks, sentence computation forms, memos to ICE, ICE detainers, and discharge notification forms. *Id.* at 344:20–345:1. Kruskol also reviewed the legal pleadings, depositions, exhibits, and other publicly available information. *Id.* at 342:9–343:4.

Moreover, reliable principles and methods were applied. *See* Order at 3, ECF No. 262. Kruskol calculated the class members' length of extended detention using what he termed "Time 1" and "Time 2." *See* Tr. at 347:6–10. Time 1 consisted of the date or timestamp an individual would have been released from custody absent an ICE detainer. *Id.* at 547:18–548:2. Kruskol calculated Time 1 based on different documents contained in inmate jackets, including bail and fine receipts and pre-release warrant checks. *See id.* at 348:8–19, 354:2–21. As he testified, Kruskol "relied heavily on what the [SCSO] had said was [their] normal process for intake and release of inmates." *Id.* at 355:5–7. Time 2 consisted of the date or timestamp an individual was finally released from SCSO custody. *Id.* at 355:11–12. Kruskol calculated Time 2 based on discharge notification forms. *Id.* at 354:20–23. From there, Kruskol's ultimate calculations

33

consisted of subtracting Time 1 from Time 2 to calculate the period of extended detention. *Id.* at 366:5–10.

Kruskol also reliably applied these principles and methods as demonstrated by his use of sensitivity checks and adjustments, *id.* at 362:7, including accounting for processing times at the SCSO, *id.* at 366:23–367:7.

Finally, there is no question Kruskol's testimony was helpful to the jury by breaking down over 10,000 pages of documents and other information to arrive at an understanding of how long class members were detained for an extended period of time.

For these reasons, Kruskol's testimony was properly admitted under Rule 702. Contrary to Defendants' argument, Rule 702 did not require Kruskol to have specific expertise in the area of analyzing inmate jackets. *See* Defs. Mot. at 25; *see, e.g., Alvez v. Affiliated Care of Putnam, Inc.*, 16-CV-1593, 2022 WL 1002817, at *7 (S.D.N.Y. Mar. 30, 2022) (Karas, J.) ("an expert need not be a specialist in the exact area [ ] implicated by the plaintiff[s'] injury, [but] he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." (internal quotation marks and citation omitted)).

And to the extent Defendants pose vague complaints about Kruskol's failure to account for the "nuances" of the class members' incarceration histories and commonality within the class, Defs. Mot. at 25, such issues go towards the weight of the evidence, not to its admissibility, *see Campbell ex rel. Campbell v. Metropolitan Prop. and Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (Kearse, Leval, & Cabranes, JJ.). A district court should exclude expert testimony only if "the flaw is large enough that the expert lacks good grounds for his or her conclusions[,]" *Amorgianos v. Nat'l Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (Walker, Sack, & Parker,

34

JJ.) (internal citations omitted), which the Court cannot say is the case here. *See also* Pls. Opp'n at 17–19 (rebutting perceived weaknesses in Kruskol's methodology).[15]

Defendants also assert Kruskol's testimony was not reliable because of the alternate calculations he conducted to account for different scenarios. Defs. Mot. at 25. The Court is not prepared to find Kruskol's methodology unreliable because he attempted to conduct a holistic analysis accounting for different variables. If anything, this demonstrates Kruskol's due diligence in adjusting his analysis to provide a reliable and comprehensive conclusion regarding detention times. And to the extent Defendants thought there was a more accurate calculation for the jury to consider, they were welcome to offer their own expert witness at trial to counter Kruskol's testimony. They chose not to.

Defendants also allude to missing data Kruskol purportedly lacked when conducting his analysis. Defs. Mot. at 25. However, any missing data would have been the product of the SCSO's own incomplete record-keeping and cannot be held against Kruskol, who still relied on a significant number of the SCSO's data points when conducting his analysis. *See* Tr. at 180:19–181:14, 304:13–16 (noting SCSO's failure to maintain complete records); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." (internal citations omitted)); *Raishevich v. Foster*, 247 F.3d 337, 343 (2d Cir. 2001) (Newman, Cabranes, & Straub, JJ.) ("If the plaintiff's inability to prove an exact amount of damages arises from actions of the defendant,

---

[15] Defendants note Plaintiffs dedicate nearly one third of the Opposition to rebutting weaknesses in Kruskol's testimony. Defs. Reply at 7. Plaintiffs may have been able to narrow the focus of their discussion regarding Kruskol's calculations had Defendants provided more than a vague attack on his methodology.

a factfinder has some latitude to make a just and reasonable estimate of damages based on relevant data.") (internal quotations and citations omitted).

      b.        *Kruskol's re-direct testimony.*

Defendants further argue it was error for the Court to refuse to strike testimony Kruskol provided on re-direct examination. Defs. Mot. at 26. Specifically, Kruskol testified he adjusted his analysis for documents Defendants—on cross examination—suggested would have made a difference to Kruskol's calculations. Tr. at 461:24–462:6. Kruskol testified, even accounting for these documents, the number of hours of extended detention would have decreased by approximately 901 hours across the entire class, i.e., by approximately one hour or less per class member. *Id.* at 462:14–20.

Defendants cite Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure in support of their argument, which requires an expert to provide "a complete statement of all opinions the witness will express and the basis and reasons for them [and] the facts or data considered by the witness in forming them[.]" Defs. Mot. at 26 (citing Fed. R. Civ. P. 26(a)(2)(B)); *see also* Defs. Mot. to Strike, ECF No. 282. Pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Plaintiffs' failure to disclose Kruskol's re-direct testimony and the basis for it ahead of time may have been a violation of Rule 26(a)(2)(B), but, even so, it was harmless. Indeed, this was not a situation where Plaintiffs ambushed Defendants with information they had planned to offer all along. Instead, the testimony was in direct response to Defendants' cross examination of Kruskol, wherein they raised certain documents Kruskol may not have accounted for in his initial

36

analysis. The testimony revealed no new methodologies or expert conclusions (the analysis in fact revealed a minimal impact on the extended detention times), and Defendants were given the opportunity to re-cross Kruskol. *See* Tr. at 464–467; *see, e.g.*, *New York v. Solvent Chem. Co., Inc.*, 685 F. Supp. 2d 357, 415 (W.D.N.Y. 2010) (Curtin, J.) (denying motion to strike expert witness' previously undisclosed trial testimony where the expert was responding to arguments from an opposition expert, was relying on the same information as the opposition expert, and the opposing party had an opportunity at trial to explore the basis for the expert's opinion), *rev'd on other grounds*, 453 Fed. Appx. 42 (2d Cir. 2011) (Jacobs, Hall, & Lynch, JJ.).[16]

For these reasons, it was not error to deny Defendants' motion to strike the re-direct testimony as it was harmless.

### 7. *Jury instructions regarding loss of liberty damages*

Seventh, Defendants argue the Court's jury instructions on loss of liberty damages were erroneous.

Defendants begin by arguing the Court erroneously used the phrases "de minimis" and "trivial," rather than the word "nominal," when describing to the jury how much in damages they may award. Defs. Mot. at 27; *see also* Jury Instructions at 36 ("By law class plaintiffs are entitled to damages for defendants' violation of [their loss of liberty]. Any monetary damages you award must be fair and reasonable and **not de minimis or trivial**." (emphasis added)). Defendants state an "instruction that damages may not be 'trivial' or 'de-minimis' improperly implicates the *amount* of compensatory damages that should be awarded, a question that is within the jury's discretion." Defs. Mot. at 27 (emphasis in original).

---

[16] Although Kruskol was not responding to an opposition expert, that is because Defendants elected to not put on a damages expert.

To the extent Defendants suggest the word "nominal" would not implicate the amount of compensatory damages a jury may award—compared to the Court's chosen phrases, "de minimis" and "trivial"—this is incorrect.  The Supreme Court recognized the significance of nominal damages in *Uzuegbunam v. Preczewski*, when it wrote "small, nominal damages are certainly concrete[,]"rejecting the notion "nominal damages are purely symbolic [or] a mere judicial token that provides no actual benefit to the plaintiff."  592 U.S. 279, 290–91 (2021).  Thus, whether the phrase de minimis, trivial, or nominal is used, all three descriptions implicate the amount of compensatory damages a jury should award, contrary to Defendants' argument.

In any event, any error would be harmless given the significant evidence of substantial extended detentions detailed by Kruskol.  *See* Tr. at 380:3–9 (noting a calculated extended detention time of 20,604.7 hours across the class).  The Court cannot say the jury would have understood a meaningful difference between the words de minimis or trivial, and the word nominal, when rendering their ultimate verdict.[17]

Defendants also complain the jury instructions erroneously stated the jury "could presume damages for emotional suffering and humiliation."  Defs. Mot. at 27 (citing Jury Instructions at 36).[18]  These instructions were presented in the context of loss of liberty damages, not procedural due process damages.  Jury Instructions at 37.  However, these instructions track the reasoning in *Kerman*, where the Second Circuit noted for wrongful imprisonment, "upon

---

[17] Defendants argue this issue has been waived because Plaintiffs failed to address it in their Opposition.  Defs. Reply at 8.  However, the Court has the discretion to consider an issue even if it has been waived.  *See Holmes v. City of New York*, 19-CV-1628, 2020 WL 918611, at *4 n.8 (S.D.N.Y. Feb. 26, 2020) (Ramos, J.).

[18] Defendants seem to be referring to the instructions appearing on page thirty-nine—not page thirty-six—of the Jury Instructions.  The word "presume" appears nowhere on page thirty-six.  *See* Jury Instructions at 36–37, 39.

38

pleading and proving merely the unlawful interference with his liberty, the plaintiff is entitled to 'general' damages for loss of time and humiliation or mental suffering." 374 F.3d at 125 (citing C. McCormick, Handbook on the Law of Damages § 107, at 375–77 (1935).

Finally, Defendants contend the Court failed to instruct the jury on causation. Defs. Mot. at 27. This is incorrect. Defendants overlook the numerous instructions the Court gave to the jury regarding the causation requirement. Jury Instructions at 39 ("You must award class plaintiffs a sum of money you believe will fairly and justly compensate them for any injury you believe they actually *sustained as a proximate result of defendant's* misconduct" (emphasis added)); *id.* at 40 ("You must award damages only for those injuries that are a *proximate result of conduct by the specific defendants* who violated class plaintiffs' rights" (emphasis added)); *id.* at 35 ("Monetary damages seek to make the class whole—that is, to compensate them for the injuries *proximately caused by defendants' unlawful conduct.*" (emphasis added)).

Defendants otherwise fall back on familiar speculative and irrelevant considerations regarding causation, which the Court rejects as discussed above. *See* Defs. Mot. at 28; *supra* § V.B.3.

### 8.    *Awarding emotional distress damages on a class-wide basis*

The eighth ground Defendants argue justifies a new trial on damages is the Court's instruction permitting the jury to award emotional distress damages—both for loss of liberty and procedural due process—on a class-wide basis. *See* Defs. Mot. at 27, 29.

However, as the Second Circuit noted in *Kerman*, general damages "need not be specifically proved[.]" 374 F.3d at 125. The Second Circuit continued to describe general damages as a "harm of a sort inseparable from [the unlawful] restraint" in the false imprisonment context which included "humiliation or mental suffering." *Id.*

39

In *Betances v. Fischer*, the U.S. District Court for the Southern District of New York stated, "a jury may be able to determine garden variety emotional damages on a class-wide basis." 403 F. Supp. 3d 212, 238 n.18 (S.D.N.Y. 2019) (Lehrburger, M.J.), *vacated by* 2024 WL 182044 (Jan. 17, 2024), *on reconsideration in* 2024 WL 3848485 (Aug. 16, 2024). And although the district court in *Betances* later vacated its initial decision and on reconsideration reinstated class certification, it did not expressly preclude the possibility of emotional damages being evaluated on a class-wide basis. *See Betances*, 2024 WL 3848485, at *7 (expressing a mere concern regarding the viability of evaluating emotional damages on a class-wide basis).

At least one other case has allowed a class to continue notwithstanding the possibility of emotional damages being awarded on a class-wide basis. *See, e.g., Langley v. Coughlin*, 15 F. Supp. 522, 558 (S.D.N.Y. 1989) (Sand, J.) ("It is true that such an approach involves a degree of inexactitude, but that is entirely defensible. Compensation for pain and suffering—*whether physical or emotional*—inevitably involves substantial inexactitude, and thus it is not surprising that the federal courts have countenanced the use of arbitrary but efficient across-the-board measures of such suffering, even in non-class cases." (emphasis added)).[19]

For these reasons, the Court does not find emotional damages cannot be awarded on a class-wide basis.

---

[19] Defendants argue *Langley* has no bearing on the analysis because it did not involve a procedural due process claim. Defs. Reply at 8. However, the relevant consideration is the *type of damages* at issue (i.e., emotional damages), not the type of claim. Defendants do not provide an explanation for why the inquiry should be focused on the cause of action as opposed to whether emotional damages have generally been determined on a class-wide basis.

## VI.    MOTION FOR REMITTUR

### A.    Applicable Law Under Federal Rule of Civil Procedure 59

The same discretion afforded a trial court when deciding a motion for a new trial applies to remittitur determinations under Rule 59. *See Lore v. City of Syracuse*, 670 F.3d 127, 176–77 (2d Cir. 2012) (Kearse, Sack, & Lynch, JJ.).

The Court may issue a conditional order of remittitur pursuant to Rule 59 "requiring a plaintiff to choose either a new trial or a reduced verdict," *id.* (internal citation omitted), when "'the award is so high as to shock the judicial conscience and constitute a denial of justice[,]'" *Dancy v. McGinley*, 843 F.3d 93, 113 (2d Cir. 2016) (Livingston, Chin, & Carney, JJ.) (quoting *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (Walker, Leval, & Katzmann, JJ.)). When determining whether an award justifies remittitur, the Court must "include consideration of the amounts awarded in other, comparable cases." *Disorbo*, 343 F.3d at 183 (internal quotations and citation omitted).

In Section 1983 cases, the Court may consider other federal Section 1983 outcomes, as well as analogous state law damage awards. *See Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990) (Timbers, Meskill, & Altimari, JJ.). In doing so, the Court "examine[s] each case individually as a unique set of facts and circumstances[,]" *Dancy*, 843 F.3d at 113, and does not "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." *DiSorbo*, 343 F.3d at 183 (internal quotation marks and citation omitted).

### B.    Analysis

Defendants argue remittitur is appropriate in this case for both the loss of liberty damages and procedural due process damages awarded by the jury. Defs. Mot. at 29–32. After reviewing

41

the cases and arguments presented by Defendants and Plaintiffs, the Court cannot say the awards in this case were so high as to shock the judicial conscience.

### 1.    *Loss of liberty damages*

Defendants argue the $75 million dollar award for the class members' loss of liberty was excessive, requiring remittitur. Defs. Mot. at 31–32. The $75 million award represents an award ranging from $3,238.00 to $3,806.00 per hour,[20] or approximately $115,000.00 per class member. *See* Pls. Opp'n at 14–15.

Defendants cite numerous cases, arguing they support finding the loss of liberty award excessive in this case.[21] *See id.* One such case, *King v. Macri*, provides little-to-no weight given the $75,000.00 award in the action was for a malicious prosecution count—not an unlawful imprisonment count. 993 F.2d 294, 297 (2d Cir. 1993) (Newman, Winter, & Miner, JJ.). Otherwise, the other cases Defendants cite awarded damages ranging from $20,000.00 to $150,000.00 for a single individual, equivalent to a range of approximately $9.16 to $893.00 per hour of unlawful detention. *See* Defs. Mot. at 31–32 (collecting cases).

In response, Plaintiffs offer cases whose damages awards ranged from approximately $2,400.00 to $33,333.00 per hour of unlawful detention. *See* Pls. Opp'n at 15 (collecting cases). Defendants argue these cases, particularly *McDevitt v. Suffolk County* and *Miller v. Terrillion,* are inapposite because they, too, involved remitted damages falling below those awarded in this

---

[20] This range accounts for adjustments Kruskol made to his calculations based on certain scenarios or sensitivities. *See* Pls. Opp'n at 14–16.

[21] It is unclear whether damages awarded in New York Court of Claims actions—three of which Defendants cite in their Motion—should be given any weight given they are not awarded by a jury, but rather by a judge. At least one court has indicated non-jury award cases provide little-to-no weight in remittitur considerations. *See Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 334 (S.D.N.Y. 2016) (Gardephe, J.). In any event, even considering these actions, the Court concludes remittitur is inappropriate in this case.

case. Defs. Reply at 8 (citing 16-CV-4164, 2024 WL 1270811 at *5–6 (E.D.N.Y. Mar. 26, 2024) (Brown, J.); then citing 16-CV-052, 2020 WL 14029629, at *7 (E.D.N.Y. Sept. 1, 2020) (Vitaliano, J.)). Although true, the $2,400.00 and $2,667.00 hourly awards in *McDevitt* and *Miller*, respectively, do not represent numbers so different from those awarded here so as to shock the judicial conscience.

Defendants also note *Gardner v. Federated Department Stores, Inc.,* and *Allay v. Verkay*—both cited by Plaintiffs—are somewhat distinguishable given the physical abuse and physical pain the plaintiffs endured in those cases. *Id.* at 8–9 (citing 907 F.2d 1348, 1350 (2d Cir. 1990) (Pratt, Miner, & Re, JJ.) (offering remittitur in amount of $6,250.00 per hour of detention); then citing 979 F. Supp. 2d 349, 372 (E.D.N.Y. 2013) (Block, J.) (awarding $33,333.33 per hour of detention). The Court has factored these differences into its consideration of the cases cited, but notes it has also considered the desperation, hunger, and sleepless nights individuals such as Orellana suffered as a result of their unlawful detention. *See supra* at 28. In any event, the Court does not find these factual differences justifies remittitur.

After considering the applicable cases cited by both parties, the Court does not find the loss of liberty damages awarded by the jury are so high as to shock the judicial conscience. *See Dancy*, 843 F.3d at 113. The Court must respect the "broad discretion" the jury has in measuring damages and does so here. *See Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) (Lumbard, Winter, & Mahoney, JJ.).

2.    *Procedural due process damages*

Second, Defendants argue the $37 million dollar award for the class members' procedural due process damages was excessive, requiring remittitur. Defs. Mot. at 29–30. The $37 million represents an award of approximately $57,000.00 per class member.

43

As an initial matter, the Court disregards any implication remittitur is appropriate because the damages award factored in fear of being deported. Defs. Mot. at 29. Such an argument is speculative and not supported by any cite to the trial record. *See id.* Moreover, it is contrary to the evidence in the record—namely, Orellana's testimony of his sadness, sleepless nights, and lack of an appetite which he tied to the lack of notice and an opportunity to be heard. *See supra* at 28.

More significant, however, is the fact *Satchell v. Clark*, which Defendants cite in favor of remittitur—is inapplicable. *See* Defs. Mot. at 30 (citing 725 F. Supp. 691, 696 (E.D.N.Y. 1989) (Bartels, J.)). Indeed, the district court's decision in *Satchell* was predicated on its finding that the plaintiff failed to adduce *any* evidence of mental or emotional suffering or distress. *Satchell*, 725 F. Supp. at 695. This is different from the current case, where sufficient evidence of mental or emotional suffering or distress *was* admitted into the record. *See supra* § V. Defendants cite no other case in support of their argument for remitter of the procedural due process damages. *See generally* Defs. Mot.

Furthermore, Defendants argue Plaintiffs' citations to *Miner v. City of Glens Falls*, 89–CV–918, 1992 WL 349668 (N.D.N.Y. Nov. 12, 1992) (Munson, J.) and *Toussie v. County of Suffolk*, 01-CV-6716, 05-CV-1814, 2012 WL 3860760 (E.D.N.Y. Sep. 6, 2012) (Seybert, J.) are inapposite because they do not involve liberty interests. Def.'s Reply at 9; *see also* Pls. Opp'n at 23. In those cases, the plaintiffs were awarded $12,500.00 for their procedural due process claims. *Miner*, 1992 WL 349668, at *17; *Toussie*, 2012 WL 3860760, at *2.

Indeed, both cases cited by Plaintiffs involved property interests rather than liberty interests. *See Miner*, 1992 WL 349668, at *1; *Toussie*, 2012 WL 3860760, at *1. However, this only militates in favor of upholding the jury's higher award in this case because the nature of

being confined to a cell without knowledge of why you are being detained, or an opportunity to challenge your detention, represents circumstances more severe than those in *Miner* and *Toussie*. This is especially so given Orellana's testimony about how he was impacted by the constitutional violation. *See supra* at 28.

Plaintiffs also cite *McClary v. Coughlin*, 87 F. Supp. 2d 205, 218–20 (W.D.N.Y. 2000) (Feldman, J.), in which the plaintiff was awarded $50,000.00 for mental and emotional distress. But, as Defendants note, *McClary* is set apart due to the fact the plaintiff was in solitary confinement for over four years, which is significantly longer than the class members in this case. *See id.* at 209. However, while *McClary* awarded $50,000.00 compared to the $57,000.00 in the instant case, the Court cannot say this difference is so substantial as to shock the judicial conscience.

The parties do not otherwise point the Court to other comparable cases involving awards of procedural due process damages. *See generally* Defs. Mot.; Pls. Opp'n; Defs. Reply. Given the awards in *Miner* and *Toussie*, combined with the more severe impact incarceration has with respect to mental and emotional distress, the Court does not find the jury's procedural due process award shocks the judicial conscience. *See Dancy*, 843 F.3d at 113.

## VII.    MOTION FOR CLASS DECERTIFICATION

### A.    Applicable Law Under Federal Rule of Civil Procedure 23

Rule 23 of the Federal Rules of Civil Procedure governs the requirements for a suit to be maintained as a class action. *See generally* Fed. R. Civ. P. 23. Rule 23(a) requires a class to "(1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." Fed. R.

Civ. P. 23(a); *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (Pooler, Hall, & Livingston, JJ.).

Additionally, a class must satisfy one of the requirements under Rule 23(b). *See* Fed. R. Civ. P. 23(b). Pertinent to this case is Rule 23(b)(3) which requires "questions of law or fact common to class members [to] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Myers*, 624 F.3d at 547 (citing Fed. R. Civ. P. 23(b)(3)) (internal quotation marks omitted).

As other courts in this circuit have recognized, Rule 23 should be construed liberally, rather than restrictively. *See, e.g., Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 528 (E.D.N.Y. 2017) (Weinstein, J.). In fact, the "general preference" of the Second Circuit is granting rather than denying class certification. *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 98–99 (E.D.N.Y. 2012) (Cogan, J.) (internal quotations and citation omitted). Nevertheless, the district court must perform a rigorous analysis to determine whether the requirements of Rule 23 have been met. *Id.* at 98. A district court "is afforded broad discretion in determining whether an action should be certified." *Kurtz*, 321 F.R.D. at 528 (internal quotation marks and citations omitted).

## B.     Analysis

Defendants move to decertify the class in this case. Defs. Mot. at 32–33. First, they argue the R&R issued by the Magistrate Judge and adopted by this Court did not consider whether to certify a procedural due process class. *Id.* at 32. Second, Defendants argue the evidence adduced at trial demonstrates the class lacks commonality and typicality with respect to Plaintiffs' loss of liberty and procedural due process claims. *Id.* at 32–33. The Court disagrees.

*1.     Procedural posture of the motion to decertify*

As a threshold matter, it is not clear Defendants' motion to decertify is procedurally proper at this stage. Although Defendants moved to decertify the class prior to the instant Motion, that was after four full days of trial. *See* Tr. at 750:15–18. At the time the instant Motion was filed, over one year passed since this Court adopted the R&R certifying the class.

Courts in this circuit have emphasized "[t]he moving party in a decertification motion bears a heavy burden to prove the necessity of either the drastic step of decertification or the less draconian but still serious step of limiting the scope of the class." *See, e.g.*, *Kloppel v. HomeDeliveryLink, Inc.*, 17-CV-6296, 2022 WL 1210484, at *2 (W.D.N.Y. Apr. 25, 2022) (Geraci, Jr., J.) (internal quotation marks and citation omitted). For this reason, courts have not disturbed prior class certification decisions "absent some significant intervening event or a showing of compelling reasons to reexamine the question." *Beh v. Cmty. Care Companions, Inc.*, 19-CV-1417, 2025 WL 1885986, at *18 (W.D.N.Y. Mar. 25, 2025) (Roemer, M.J.) (internal quotation marks and citation omitted), *report and recommendation adopted by* 2025 WL 1739769 (W.D.N.Y. June 23, 2025) (Sinatra, Jr., J.). Significant intervening events or compelling reasons may include a change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. *Id.*

Defendants cite *Jin v. Shanghai Original, Inc.* arguing it directly contradicts the notion an intervening event, or the like, is required to decertify a class. Defs. Reply at 10 (citing 990 F.3d 251, 261 (2d Cir. 2021) (Livingston, Kearse, & Wesley, JJ.)). However, the Second Circuit in *Jin* dealt with a different situation than the one at hand. In *Jin*, the issue was whether a significant intervening event was required when the district court *sua sponte* raised issues with class certification. *Jin*, 990 F.3d at 262. Indeed, the Second Circuit explicitly acknowledged it was

47

not addressing the issue of what is required when a defendant moves to decertify. *Id.* at n.18. In truth, the Second Circuit has explicitly recognized the approach of district courts in this circuit which have required some form of a significant intervening event, such as a sufficient change in law or circumstances. *Id.* For this reason, *Jin* does not stand for the proposition Defendants have put forth.

Applying the above standard, Defendants do not cite any change in controlling law or a need to correct a clear error or prevent manifest injustice. *See generally* Defs. Reply. Instead, Defendants hang the validity of their motion to decertify on evidence adduced at trial. *Id.* at 10. However, Defendants do not argue it is *new* evidence they did not possess at the class certification stage which justifies decertification. In short, Defendants offer nothing this Court has not already considered with respect to class certification. For this reason, Defendants fail to meet their heavy burden of establishing some significant intervening event or a compelling reason to reexamine the question of class certification.

2.      *Certification of a procedural due process class*

Even assuming, *arguendo*, Defendants' motion to decertify is procedurally proper, the Court finds it fails on the merits. First, the Court rejects Defendants' contention the Court did not consider a procedural due process class when adopting the R&R. *See* Defs. Mot. at 32. This Court certified a class defined as follows:

> All persons who, from [July 18], 2014 through November 15, 2018, were detained by the [SCSO] and against whom [ICE] issued an immigration detainer request pursuant to which SCSO continued to detain the individual after SCSO's detention authority had expired.

R. & R. at 10, 23.

Nowhere in this definition did the R&R or the Court limit the class to exclude those members asserting a procedural due process claim. *See generally* R. & R. Moreover, in her

48

well-reasoned R&R, Magistrate Judge Lindsay expressly recognized Plaintiffs were bringing suit for violations of the class members' due process rights under the Fourteenth Amendment of the U.S. Constitution. R. & R. at 10 ("[T]he [P]laintiffs claim that the detentions of putative class members pursuant to ICE detainers and accompanying warrants were . . . without due process protections, and thus, violated their rights under the Fourth and Fourteenth Amendments of the United States Constitution and under the First Article of the New York State Constitution.").

As the Second Circuit has held, there is no requirement "that the district court *utilize* any particular verbal formula, nor that the district court make express findings on each requirement. Where the basis of the district court's ruling is obvious in context, we will not reverse a class certification simply because the district court has not explicitly recited each finding." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251–52 (2d Cir. 2011) (Newman, Miner, & Lynch, JJ.) (emphasis in original). For this reason, Defendants' argument regarding the Court's adopted R&R fails.

### 3. Commonality and typicality of the class

The Court will not rehash the entirety of the R&R's reasoning here. Instead, the Court focuses on the particular, although underdeveloped, grounds Defendants rest their Motion upon. Specifically, Defendants argue the class lacks commonality and typicality as required under Rule 23. Defs. Mot. at 32–33. Defendants' arguments are unpersuasive.

The class satisfied the commonality requirement for both the loss of liberty and procedural due process claims. As the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. 338, 350 (2011) (emphasis in the original and

49

internal citation omitted). The class members must have "suffered the same injury[.]" *Id.* at 350 (internal citation omitted). The Court finds they have.

With respect to loss of liberty, Orellana's representative evidence of the injury and damages he suffered due to the violations of his Fourth Amendment rights under the U.S. Constitution and rights under the New York State Constitution could generate answers apt to resolve the damages issue with respect to the other class members. *See supra* at 28. With respect to procedural due process, evidence weighing on whether inmates were given actual notice or a meaningful opportunity to be heard could generate common answers to resolve issues concerning the class at-large. *See supra* § III. The same is true for evidence establishing class members' injuries and damages resulting from the violation of their due process rights. *See supra* § V.

Defendants' arguments to the contrary are unpersuasive. First, just because some class members may have been held in ICE custody for a portion of their detention does not negate the aforementioned common questions of fact or law still connecting them.[22] *See* Defs. Mot. at 33.

Second, Defendants argue Hernandez's unavailability at trial and the lack of testimony from him regarding procedural due process damages automatically translates into the conclusion he suffered no damages whatsoever. *Id.* at 33. Even assuming this is true, Defendants' argument ignores other aspects of the procedural due process claim presenting common questions of fact or law—such as whether liability was established—of which Hernandez's deposition testimony provides evidence. *See supra* § III.B. Moreover, as Defendants note, Orellana provided testimony regarding damages, which can provide evidence of injury and damages on a class-wide basis. *See supra* at 28; Defs. Mot. at 32.

---

[22] Defendants do not challenge the predominance requirement is satisfied under Rule 23(b)(3). *See generally* Defs. Mot.; Defs. Reply.

Third, the mere fact Orellana could not remember certain details, *see* Defs. Mot. at 33, goes towards the weight of his testimony as evaluated by the jury, and is thus insufficient to find a lack of commonality, especially given the other details Orellana could remember which helped establish the violations of constitutional rights at issue on a class-wide basis. *See supra* at 15.

Finally, as discussed above, just because Hernandez admitted he was served with a detainer for one of his detentions is not dispositive of the procedural due process issue for other detentions. *See supra* § III.B. To decertify the class because Hernandez was unavailable at trial when his testimony still provided evidence to generate common answers on the procedural due process claim—and when Orellana's testimony provided representative evidence on the question of procedural due process damages—would go too far and be inconsistent with the standards Plaintiffs are required to meet under Rule 23.

Defendants also argue the typicality requirement has not been met. Defs. Mot. at 33. Defendants offer no specific argument regarding why typicality is lacking for Plaintiffs regarding the loss of liberty claim. *See id.* at 33. The only specific argument Defendants offer with respect to the procedural due process claim is Orellana is not typical because he unsuccessfully contested the legality of his detention in Immigration Court. *Id.* However, as discussed earlier, the evidence Defendants reference is lacking with respect to whether his Immigration Court challenge was conducted anywhere near the point in time when his constitutional rights would have been violated. *See supra* at 16–17. Said otherwise, Defendants have not established Orellana's use of the Immigration Court afforded him a meaningful opportunity to be heard.

For these reasons, the Court refuses to decertify the class, and maintains its agreement with the reasoning outlined in the adopted R&R.

51

## VIII.  CONCLUSION

Thomas Jefferson once wrote:

> "I consider trial by jury as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution."

*Galloway v. United States*, 319 U.S. 372, 397 n.1 (1943) (Black, Douglas, & Murphy, JJ., dissenting) (citing 3 Writings of Thomas Jefferson (Washington ed.) 71).

U.S. Senator Daniel Patrick Moynihan expressed a different but equally important sentiment:

> "Everyone is entitled to his own opinion, but not his own facts."

Daniel Patrick Moynihan, *More Than Social Security Was at Stake*, Wash. Post, Jan. 18, 1983.

On the record before it, and after considering carefully the arguments made by the parties, the Court cannot say exceptional circumstances are present here which would justify displacing the verdict of the unanimous and duly impaneled jury.  While Defendants are entitled to their opinion, the law and the facts in this case support the verdict and judgment this Court entered.  Headlines to the contrary notwithstanding, Dewey did not defeat Truman.  Headlines to the contrary, Defendants did not defeat Plaintiffs.  For the foregoing reasons, the Court **DENIES** Defendants' motions.

SO ORDERED.

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 24, 2026
      Brooklyn, New York